MEMORANDUM. The Hon. GEO. MORELL, late Chief Justice of the Supreme Court and Judge of the First Circuit, left the Bench on the expiration of his term of office, on the 18th day of July, 1843. On the 9th day of March, 1843, the Hon. EPAPHRODITUS RANSOM, was appointed Chief Justice, and re-appointed Judge of the Third Circuit; the Hon. ALPHEUS FELCH, was re-appointed Associate Justice, and Judge of the Second Circuit, and the Hon. DANIEL GOODWIN, was appointed Associate Justice, and Judge of the First Circuit, for the terms of office commencing, respectively, on the 18th day of July, 1843.

---

THE PRESIDENT, DIRECTORS AND COMPANY OF THE MICHIGAN STATE BANK *v.* EUROTAS P. HASTINGS, CHARLES G. HAMMOND, JOHN J. ADAM AND ROBERT P. ELDREDGE.

The repeal of the charter of a banking incorporation, which contains no reservation of the power to repeal, is a violation of that provision of the constitution of the United States, which declares that " no state shall pass any law impairing the obligation of contracts," and is therefore void.

A state cannot be sued in its own courts; but this rule applies only where the state is made a party defendant to the record; and where the defendants were the late

VOL. I.      29

Michigan State Bank *v.* Hastings.

Auditor General, and his successor in office, the Secretary of State, and State Treasurer, and the complainants' bill sought to reach property held by them in their official capacity, *Held*, that the Court of Chancery had jurisdiction, although the state might be interested in the subject matter of the suit.

The rule which prohibits a court of chancery from making a decree unless all those who are substantially interested be made parties to the suit, is inapplicable in a case where it is not in the power of the complainants to make them parties.

The Michigan State Bank, being indebted to the state of Michigan, conveyed to the state, in satisfaction of such indebtedness, certain real and personal property. In the agreement for the conveyance of the property, between the bank and the commissioners empowered by the state to settle with the bank, it was declared that the assignment of the property was made upon, and subject to, the express condition, that the state should indemnify and save harmless the bank from and against certain claims and liabilities therein mentioned. *Held*, that this was a conveyance upon a condition subsequent, and that the property would revert to the bank on failure of the state to perform the condition.

*Held*, also, that there could be no breach of the condition, until the bank was actually damnified; and that an allegation that the state had not paid a bond and mortgage of the bank, which was one of the liabilities mentioned in the condition, but had permitted the same to be foreclosed, and the mortgaged premises to be sold at a great sacrifice, much below their real value, and that it had refused to pay off and satisfy the balance still due on said bond, for which the bank had been threatened with a suit, did not show such damnification.

*Held*, also, that, treating the condition as a *covenant* to indemnify, the bank would not, upon an allegation of these facts as a breach of the covenant, be entitled to an equitable lien upon the property for the payment of the liabilities mentioned in the covenant.

*Held*, also, that a court of equity would not enforce a specific performance of the covenant, before the bank had been actually damnified; nor even afterwards, as this could only be done in a proceeding directly against the state, who could not be made a party defendant to a suit.

*Quere*, whether such *condition* could be treated as a *covenant* to indemnify.

After the execution of the agreement between the bank and the commissioners on behalf of the state, the state took possession of the property thereby conveyed, and exercised acts of ownership and control over it, and, on the 17th day of February, 1842, the legislature of the state passed an act, constituting certain state officers trustees on behalf of the state, to take charge of the property, empowering them to dispose of it, requiring that the proceeds should be paid into the state treasury, and used for the redemption of state scrip, and expressly sanctioning the agreement, *except so much thereof as purported to bind the state to indemnify the bank, or to*

*pay or advance money to discharge incumbrances, or for any other purpose, which portions were thereby expressly rejected.* (S. L. 1842, p. 110.) *Held,* that the state had not the power to hold the property conveyed, and yet reject the condition upon which the conveyance was made; and that so much of the act of February 17, 1842, as purported to do so, was unconstitutional and void.

*Held,* also, that the declaration, in the act of February 17, 1842, that the state rejected the condition, did not, in itself, constitute a breach of the condition.

*Held,* also, that by acting upon the agreement between the bank and the commissioners, by exercising acts of ownership over the property conveyed, and also by the act of February 17, 1842, the state had recognized and affirmed the act of the commissioners in making the agreement, whether the commissioners originally had power to agree to the condition therein contained or not.

APPEAL from the Court of Chancery.

The complainants filed their original bill in the Court below, against Eurotas P. Hastings alone, setting forth the following facts :

In 1839, the complainants were indebted to the state of Michigan, in the sum of $500,000, or thereabouts; and, in February of the same year, became embarrassed, and stopped payment. In February, 1840, the legislature passed an act authorizing the Auditor General, State Treasurer, and Secretary of State, for the time being, to settle with the bank upon such terms as they might deem equitable, and appointing them commissioners for that purpose; (S. L. 1840, p. 9,) but the bank refused to settle with them, until the forfeiture of its charter, incurred by reason of its failure to pay its liabilities in specie, was remitted. On the 28th day of March, 1840, the legislature passed an act, declaring that if the bank should settle with the commissioners under the law before mentioned, and should resume specie payments on or before the first day of April, 1841, then nothing done or suffered by the Bank, previous to that act, should in any way affect their chartered privileges. (S. L. 1840, p. 128.) On the first day of May, thereafter, the complainants settled with the commissioners agreeably to the provisions of the act first mentioned, and

assigned, transferred, delivered, and set over to them, in payment of the debt due to the state, bills, notes, accounts, lands and other property, amounting to $633,567.98. The following indenture was thereupon executed by the commissioners on behalf of the state, and by the president of the bank on behalf of the complainants, which contains the terms of the settlement.

" This indenture, made this first day of May, in the year of our Lord one thousand eight hundred and forty, between the president, directors, and company of the Michigan State Bank, of the first part, and Eurotas P. Hastings, Auditor General, Robert Stuart, Treasurer, and Thomas Rowland, Secretary of the State of Michigan, commissioners for and on behalf of the State of Michigan for the purpose of settling with the party of the first part, parties of the second part, witnesseth :

" That the party of the first part, for the purpose aforesaid, doth hereby assign, transfer, and set over to the parties of the second part, all the beneficial interest of the party of the first part, in and to all the property, effects, notes, accounts, real estate, mortgage securities, and choses in action, contained in schedule marked A, hereunto annexed, with all the rights, privileges and appurtenances thereunto belonging, and with all the collateral securities by the party of the first part, held, for and on account of them or any of them, in full payment and satisfaction of all debts and liabilities of the party of the first part, to the state of Michigan; subject, nevertheless, to all and any discrepancies in the accounts and demands, arising from errors or contingent claims, and also subject to all just charges of counsel and expenses heretofore accrued and hereafter to accrue, upon such as are in process of collection at law, or in chancery ; and the party of the first part doth hereby authorize, constitute and appoint the parties of the second part, and each of them, their suc-

cessors and assigns, or such other person as may be appointed by the legislature, the attorneys of the party of the first part, to sell, convey, alien, lease, assign, collect, secure, commute and compromise, all and singular, the property and demands in said schedule described, in their own names, or in that of the party of the first part, but at their own proper costs and charges, and all deeds, leases and acquittances to give, necessary in the premises, hereby ratifying and confirming all their lawful acts and doings in the matters aforesaid. And the party of the first part hereby covenant and agree, to and with the parties of the second part, that it will grant to the said parties of the second part, their agent or attorney, at all reasonable times, access to such books and papers connected with the property and demands mentioned in said schedule A, as are or may be in its possession, and as shall and may be necessary, and to furnish all such information, from time to time, to the parties of the second part, as they may desire, and the party of the first part, or its officers, may be possessed of, or knowing to, in the premises.

" And the parties of the second part, by virtue of the authority vested in them, by an act entitled " an act authorizing the Auditor General, the State Treasurer, and the Secretary of State, for the time being, to settle with the Michigan State Bank," approved February 1st, A. D. 1840, and by an act entitled " an act in relation to the Michigan State Bank," approved March 28th, 1840, do hereby, in consideration of the conveyance, covenants and stipulations of the party of the first part, herein before set forth, fully acquit and discharge the said party of the first part from all claims, debts, dues and demands against the said party of the first part, and in favor of the state of Michigan, and from all liability thereon, or on account of the premises, to the state of Michigan aforesaid.

" And it is hereby understood by and between the par-

ties of the first and second part, that the assignments of the property and effects contained in schedule A, is made *upon and subject to the express condition that the state of Michigan shall indemnify and save harmless* the party of the first part, and their grantors, immediate and remote, from and against the several claims and liabilities herein after specified, for ever, viz :   A certain bond and mortgage, executed by the party of the first part, to the Bank of Michigan, upon their banking house and lot, this day conveyed by the party of the first part to the Auditor General, subject to said mortgage, upon which there remains unpaid the principal sum of $11,250 ; also, a certain bond and mortgage, executed by Lansing ·B. Mizner to James H. Wood, dated October 19th, A. D. 1838, on a house ·and lot this day conveyed by the party of the first part to the Auditor General, subject to said mortgage, upon which the principal sum of $1,500 remains unpaid ; also, a certain bond and mortgage, executed by Eurotas P. Hastings to William W. Miller, upon lots eight, nine, fifty·four and fifty-five, in section four, in the city of Detroit, this day conveyed by the party of the first part to the Auditor General, upon which the principal sum of $10,000 remains unpaid ; also, all and sundry claims by and in favor of attorneys and agents, for professional services and disbursements, in and about the collection and securing of all or any of the demands set forth in said schedule A, which have accrued or may hereafter accrue, upon any collateral securities which are transferred to the state of Michigan, and more particularly set forth in schedule marked B, hereunto annexed.   In testimony whereof," &c.

The bill states and charges that the state had realized a large amount of money from the property so assigned ; that the money had gone into the state treasury ; that the state had not repudiated the settlement ; that it had taken no measures to indemnify and save harmless the complain-

ants from the bond and mortgage upon their banking house and lot, executed by the complainants to the Bank of Michigan, and mentioned in the said indenture, or from the other liabilities therein mentioned ;—but, that on the 17th day of February, 1842, the legislature passed an act constituting the Auditor General, State Treasurer, and Secretary of State, for the time being, trustees, on behalf of the state, to take charge of the assets and property so assigned to the state, and sanctioning the agreement entered into between the complainants and the commissioners under the act of March 28, 1840, except so much thereof as purported to bind the state to indemnify the complainants, or to pay or advance money to discharge incumbrances, or for any other purpose ; which portions of said agreement were expressly rejected.    The act also empowered the trustees to sell or lease the property, and to collect, compromise, or extend the time of payment of the debts assigned, and required, that the money which might be realized therefrom, should be paid into the state treasury, and used for the redemption of state scrip.    (S. L. 1842, p. 110.)    The bill then charges that the state had not paid the bond and mortgage given to the Bank of Michigan, but had permitted the same to be foreclosed, and the mortgaged property to be sold at a great sacrifice for much below its real value ; and that it had refused to pay off and satisfy the balance still due on said bond, amounting to $7,000, for which the complainants had been threatened with a suit.

The bill charged, also, that the state was insolvent and unable to pay its debts ; that much of the property had been permitted to become worthless through inattention, and many of the debts had been lost from the same cause; and that from others, very large amounts of money had been realized by the state, which it was unwilling to refund to the complainants; that the settlement and agree-

ment could not be set aside or repudiated by the complainants, because it was beyond the power of the state to place the complainants in the same position they were in when the settlement was made; and that a large amount of the property so assigned by the complainants, was in the hands of the defendant, Eurotas P. Hastings, one of the commissioners; which amount was sufficient to pay the liabilities mentioned in the condition of the said assignment.

The complainants subsequently filed an amended bill, which, in addition to the matters contained in the original bill, stated, that most if not all of the real estate conveyed by virtue of said settlement, was conveyed to Eurotas P. Hastings, Auditor General, and his successors in office, and had not been by him, or his successors, sold or transferred; that some parcels of it had been leased by Hastings, and were producing a large income, which was received by the acting Auditor General, or State Treasurer, and appropriated to the use of the state; that the Auditor General, Charles G. Hammond, the Treasurer of the state, John J. Adam, and the Secretary of State, Robert P. Eldredge, were in the possession and control of many parcels of the property assigned, and claimed the right as trustees under the act of February 17, 1842, before mentioned, to control and possess all of the same, on behalf of the state, including that portion of the property which remained in the possession of said Hastings, and had, since the filing of the original bill, by virtue of their pretended right, settled with one or more of the makers of the promissory notes so assigned, and still under the control of said Hastings; that all of the property and assets assigned, were in their possession and control, except such as were still in the possession of said Hastings, and that, as trustees as aforesaid, they were exercising all the means in their power to convert the same into available funds for the use of the state, regardless of the condition con-

tained in said indenture, and that no measures had been taken by the state or its officers to fulfil said condition.

The complainants then aver that they have faithfully and punctually fulfilled all the stipulations on their part to be fulfilled, in and by said settlement, and all the requirements of the several acts before referred to.

The complainants, among other things, prayed that the defendants might be adjudged trustees for their benefit, of the real and personal estate so assigned, and that so much thereof might be sold, as might be sufficient to pay off the debts mentioned in the condition of said indenture, and the proceeds thereof applied to the payment of said debts; and that the complainants might be saved harmless and indemnified therefrom. There was also a prayer for general relief.

To this bill the defendants interposed a general demurrer, which after argument was sustained by the Chancellor, and the bill ordered to be dismissed. To reverse this order, the cause was appealed by the complainants to this Court.

*Van Dyke & Harrington,* in support of the demurrer.

*Joy & Porter,* contra.

WHIPPLE, J. delivered the opinion of the Court.

The demurrer in this case is general, and puts in issue the right of the complainants to an answer upon the case made by the bill.

1. In support of the demurrer it is contended, that, by the "Act to annul the corporate rights of certain banks and for other purposes," approved February 16, 1842, (S. L. 1842, p. 56,) the charter of the Michigan State Bank was unconditionally repealed, and that, therefore, the Court below had no jurisdiction of the case, there being, in fact, no such corporation as the Michigan State Bank. Whether the complainants had a legal existence after the date

of this repealing act, must depend upon the validity of the act. A corporation is a franchise, which, in England, is created by royal charter or by act of parliament. In the United States, corporations are generally created by act of the legislature. By the civil law, corporate communities, intended to be permanent, could not exist unless confirmed by the sovereign. Brown's Civil Law, 101, '2. The power, therefore, of creating corporations, resides in the sovereign. In England, a corporation may be dissolved, first, by act of parliament; secondly, by loss of all its members, or of an integral part, by death or otherwise; thirdly, by the surrender of its franchises; and fourthly, by forfeiture of its charter, through negligence or abuse of the privileges conferred by it. The authority of parliament to dissolve a corporation, results from the theory of the British constitution, which recognizes the omnipotency of parliament. But the legislative power of this state is abridged and controlled by the constitution of the United States, and by our own local constitution. Any legislative act contravening the provisions of either, would be absolutely void and inoperative. Does the act referred to contravene any provision of either the federal, or our state constitution? If this question was an original one, I should feel bound to give to the arguments of counsel the most careful and deliberate consideration; but if there is any one question more firmly settled than another, it is, that "a private corporation, whether civil or elemosynary, is a contract between the government and the corporators; and the legislature cannot repeal, impair, or alter the rights and privileges conferred by the charter, against the consent, and without the default of the corporation, judicially declared and ascertained." 2 Kent's Com. 306; 4 Wheat. R. 318; 6 Cranch R. 88; 7 id. 164; 9 id. 43, 292. If the question was now open for discussion, it might well be doubted whether *the mere grant of a*

*franchise*, as in the present case, was a contract within the true meaning and spirit of that provision of the constitution of the United States, which declares that " no state shall pass any law impairing the obligation of contracts." We might be permitted to look beyond the provision itself, into the reasons which led to its adoption. But we have before had occasion to remark that the decisions of the Supreme Court of the United States, upon all questions arising under the constitution, are final and conclusive. They must bind the judgment, although the understanding may not always be convinced. If it were otherwise, the consequences would be disastrous in the extreme. We should have a constitution, it is true, but uncertainty and instability would be impressed upon it, and there would be jarring and discordant conflicts of decision between the federal and state judicial tribunals. I feel bound, therefore, to disregard the act repealing the charter of the Michigan State Bank. I must treat it as void and nugatory.

2. It is insisted that the *state* is the *real* party in interest, and that, for this reason, the Court below had no jurisdiction of the case. The demurrer was sustained by the Court below upon the sole ground that the state was, in fact, the party defendant. Walk. Ch. R. 9. And as the Chancellor gave no opinion upon the several other points raised by the case, and which it is understood were argued before him, it is fair to presume that he entertained a strong conviction of the correctness of his views upon this single question. This consideration alone has induced me to give to this point a very full and careful examination, the result of which has been the undoubting conviction, that, notwithstanding the state is directly interested in the event of this suit, yet this circumstance constituted no objection to the jurisdiction of the Court of Chancery,

and that the demurrer cannot be sustained upon this ground.

The principle is well settled that, while a state may sue, it cannot be sued in its own courts, unless, indeed, it consents to submit itself to their jurisdiction. This is done in cases where the state claims something in opposition to a claim set up by an individual, and where the controversy depends upon the solution of legal principles involved in intricacy and doubt. These questions can be best determined by the judiciary; and an act of the legislature, conferring jurisdiction upon the courts in the particular case, is the usual mode by which the state consents to submit its rights to the judgment of the judiciary. The method, at common law, of obtaining possession or restitution from the crown, of real or personal property, is by what is termed a petition of right; and Blackstone states the general rule thus: "if any man has, in point of property, a just demand upon the King, he must petition him in his court of chancery, where his chancellor will administer right as matter of grace, though not upon compulsion." 1 Bl. Com. 203. This is consonant to what is laid down by writers on natural and public law. Puffendorf says that, "a subject, so long as he continues a subject, hath no way to oblige his prince to give him his due where he refuses it; though no wise prince will ever refuse to stand to a lawful contract. And, if the prince gives the subject leave to enter an action against him upon such contract in his own court, the action itself proceeds rather upon natural equity, than upon the municipal laws. For the end of that action is, not to compel the prince to observe the contract, but to persuade him." 2 Pet. Cond. R. 646. It is useless, however, to multiply authorities upon the question as to whether a state can be sued in its own courts. The only remedy for a party who has entered into a contract with a state, is by an appeal to the le-

gislature, who, it is fair to presume, will, from motives of public duty, make provision for its full execution, and do ample justice to the party with whom it may have contracted; or else refer the case to the decision and judgment of the judiciary, by a special legislative enactment.

The real question for us to determine is, what is to be understood by the rule, admitted by both parties to be well established, that *a state cannot be sued in its own courts;* or, in other words, that a suit cannot be instituted against a state in its own courts.   On the part of the defendants it is contended, that, although the state is not, and could not have been made *a party to the record,* yet the bill, on its face, shows that the state is the party in interest; and this being the case, the court can no more take jurisdiction, than it could have done, had the state been made a party defendant to the bill, and appeared in that character upon the record.   On the other hand, it is contended on the part of the complainants, that in cases where jurisdiction depends upon the party, it is the *party named in the record;* and that the court will not, upon a question of jurisdiction, stop to inquire as to the interest of third persons, not named in the record, and who may be affected by the judgment or decree.

Can it be said that a person is sued, or that a suit has been instituted against a person, when such person is not named as a party defendant in the proceedings in a cause, and does not appear in that character upon the record? I apprehend not.   Can a person, in a suit at law, be considered as a party defendant, unless his name appears as such in the suit, declaration, and other pleadings filed in the orderly and regular course prescribed by law for conducting suits, and the practice of courts?   He certainly cannot.   Can a person be considered as a party defendant in a suit in chancery, unless he is made such party in the bill, and in the process by which defendants are legally

brought into court? I think not. I have in vain searched for a case in the English books, where a person has been regarded as a party to a suit, who is not made one by the proceedings in the case, and does not appear as a party in the record. The *record* in all cases is to determine who are parties to a case. In this case nothing appears on the record to show that the state is, in a legal and technical sense, a party defendant. But, it is said that the interest of the present defendants is merely nominal, and that the state is the *real party* in interest, and of consequence the real party to the record. The determination of this question must depend upon the facts stated in the bill, and the law arising upon those facts. It may be that this assumption of counsel is not warranted by the law and the facts. It may turn out, that, *in point of law*, the state are not exclusively interested in the case;—that they have no rightful interest in the subject matter of this suit; and that the present defendants are not merely nominal, but real parties in interest. But, before entering upon an extended examination of these questions, let it be assumed that the state has a direct legal interest in the subject matter of the suit, and of course in its result. Does it necessarily follow that the Court below, had no jurisdiction of the case? The act of 17th February, 1842, (S. L. 1842, p. 110,) provides that the trustees therein named, should, in behalf of the state, take charge of the assets assigned by the Michigan State Bank, with power to lease, sell, or convey the same ; and to pay into the treasury the moneys they may collect, to be used for the redemption of state scrip. The defendants, it is alledged in the bill, have now in their possession a large amount of the assets so assigned, and assume to hold and control the same by virtue of the act aforesaid. The right of the defendants, therefore, to hold, control, and dispose of the assets in question, is based upon that act. It is fair to presume, then, that

the defendants will carry into effect its provisions : indeed, it is charged in the bill, that they have converted into money a large portion of the assets, and are disposing of the same from time to time.   Now, suppose that the act under which the defendants claim the right to hold these assets, is nugatory and void.   It would follow, as a a neces- sary legal inference, that their possession is tortious and their acts void.   Suppose also, that it should appear that the state, at the time the act referred to was passed, had, in point of law, no interest or property in those assets. Would it be contended, under such a state of things, that the preventive justice of the country could not be invo- ked by the complainants, to stay the proceedings of the defendants, under the other averments contained in the bill ?   It could not be so contended, although the state were not a party to the record.   The state need not be made a party to the record, for the reason that it would not, in the supposed case, have any legal interest in the sub- ject matter of the suit; but, if a legal interest did actually exist, it could not be made a party, for the reason that a state cannot be sued.   But shall it be said that there is no power to stay the arm of a state officer, acting under the authority of a law which is void ?   Must a party against whom the blow is aimed, await calmly until that blow is actually struck, and then seek a remedy, when that reme- dy would be utterly inefficient?   Not so is the law.   Upon a case made by a bill, showing the entire want of authori- ty on the part of an officer to do an act, which act, when actually done, would leave the injured party remediless, a court of equity would grant its injunction to ward off the blow, although the state might be directly interested in having the act done.   To illustrate my views upon this point : the state claims title to a tract of land, rendered valuable, chiefly in consequence of the timber growing on it ; suppose the state were to put the land in possession of

an agent, with instructions to cut down the timber, and appropriate it to the uses designated by the state. Suppose one of its citizens, claiming title to the land under a grant from the state, should file his bill, showing himself the legal owner of the land, under a title derived directly from the state, and charging upon the agent of the state thus engaged under its authority, acts which amount to waste. Would a court of chancery refuse its interposition, because the defendants, who were committing the wrong and destroying the inheritance, were acting under the authority of the state, and because the state, who has an interest in the case, is not, and could not be made a party? I think not. But suppose after the timber has been actually cut and severed from the freehold, the claimant should bring replevin or detinue against the agent of the state, who was in actual possession of the timber. Would a court of law dismiss the cause for want of jurisdiction, upon proof of the fact that the defendant was acting under the authority of the state, and that the timber was the property of the state,—that the state was directly interested in the event of the suit? I apprehend not, and that in this, as in other cases, the court would impose upon the defendant the necessity of establishing his defence by evidence. Again: suppose that instead of treating the agent as a tort feasor, the claimant should waive the tort and bring assumpsit for money held by him and arising from the sale of the timber, under the authority of the state. Would a court of law turn the plaintiff out of court because the state claimed the money? I apprehend not. I might multiply such illustrations indefinitely, but will content myself with one or two others, which are familiar to our courts, and of frequent occurrence. Suppose the state, having obtained a judgment against A, levies an execution, founded on the judgment, upon property owned by B; the officer making the levy refuses to recognize

the claim of B, who thereupon brings replevin for the property; the officer appears and justifies under the judgment and execution; but these show that the state is the real party in interest : would the court, for this reason, assume that they had no jurisdiction of the cause ?  I take it not. They would say to the officer that his process commanded him to take the property of the judgment debtor, and not of a stranger, and that his acts were void.   An individual imports goods from a foreign country, which the collector of a port claims are liable to duty; this is denied by the importer.   In order to obtain possession of the goods, however, he pays to the collector the amount of duty demanded, protesting against its validity ; an action is brought by the importer against the collector, to recover back the money thus illegally demanded by the collector, and by him paid.   It is quite clear, that, in such a case, the real parties in interest are the importer and the United States; and yet the courts are in the daily habit of entertaining jurisdiction in such cases.   This illustration is a very striking one in favor of the position, that it is the party to the record, and not the interest of strangers to that record in the subject matter of the suit, which determines the question of jurisdiction.

I am not, however, driven to the necessity of relying upon my own erring judgment in determining this question of jurisdiction, but draw support from a case of much celebrity which is familiar to the mind of every lawyer,— I mean the case of *Osborn* v. *The Bank of the United States,* 9 Wheat. R. 738.   I propose to examine that case somewhat critically, as I think it settles conclusively two questions decided in the case at bar.   The Bank of the United States exhibited their bill in the Circuit Court of the United States, for the district of Ohio, praying that Osborn, the auditor of the state, might be restrained by injunction from proceeding against the bank, under an act of the state

of Ohio, entitled " An act to levy and collect a tax from all banks, and individuals, and companies and associations of individuals, that may transact banking business in this state, without being allowed to do so by the laws thereof." This act, after reciting that the Bank of the United States pursued its operations contrary to the laws of the state enacted that if, after the first day of the following September, the said bank, or any other, should continue to transact business in the state, it should be liable to an annual tax of $5,000 on each office of discount and deposite; and that, on the fifteenth day of September, the auditor should charge such tax to the bank, and should make out his warrant, under his seal of office, directed to any person, commanding him to collect the said tax, &c. The bill, after reciting this act, stated that Osborn was the auditor of the state, and gave out, &c. that he would execute the said act. Upon this bill an order was made, awarding an injunction, &c., which was served on Osborn, and one Harper, on the 18th September. The affidavit of the officer who served the injunction, stated that he served the same on Harper, while on his way to Columbus, with the money and funds on which the same were to operate, as he understood; and that the writ was served on Osborn, before Harper reached Columbus.

A supplemental and amended bill was afterwards filed in September, 1820, making new parties. The amended bill charged, that subsequent to the service of the injunction and subpœna, Harper, who was employed by Osborn to collect the tax, proceeded to the office of the bank, in Chillicothe, and took therefrom $100,000 in specie and bank notes, belonging to, or in deposite with, the plaintiff; that this money was delivered to one Curry, who was the treasurer of the state, or to the defendant, Osborn, both of whom had notice of the seizure, and paid no consideration therefor, but received it to keep it a safe deposite ;—

that Curry kept the money until he delivered it over to one Sullivan, his successor in office;—and that neither Curry nor Sullivan, held the money in their character as treasurer, but as individuals.   The bill prayed that Osborn, Curry and Sullivan, in their official and private characters, and Harper, might be made defendants, and enjoined from using or paying away the money taken from the bank, and that the money be returned, &c.   Curry filed his answer, admitting, that Harper delivered to him on the 20th September, 1819, the sum of $98,000, the amount of the tax levied upon the bank, and that he passed the same to the credit of the state as revenue, but in fact kept it separate from other moneys until January or February, 1820, when the moneys in the treasury were seized upon by a committee of the house of representatives; that soon after he delivered over the said moneys to Sullivan, his successor, and took his receipt for the same.   The answer of Sullivan, among other things, admits that he gave a receipt to the treasurer for the $98,000, and held it only as state treasurer.   The cause was heard upon the bill, and the answers of Curry and Sullivan, and a decree was made, directing the restoration of the money to the bank ; from which decree an appeal was taken to the Supreme Court of the United States.

The cause was argued with uncommon power and ability by eminent counsel, and a learned opinion was pronounced by the late Chief Justice *Marshall.*

Among other grounds, the appellants claimed that the decree ought to be reversed, because, if any case was made by the bill proper for the interference of a court of chancery, it was against the state of Ohio, in which case the Circuit Court could not exercise jurisdiction.   The reasoning of the Chief Justice upon this point is as follows:

" The bill is brought, it is said, for the purpose of pro-

tecting the bank in the exercise of a franchise, granted by a law of the United States, which franchise the state of Ohio asserts a right to invade, and is about to invade. It prays the aid of the court to restrain the officers of the state from executing the law. It is, then, a *controversy between the bank and the state of Ohio.* The interest of the state is direct and immediate, not consequential. The process of the court, though not directed against the state by name, *acts directly upon it,* by restraining its officers. The process, therefore, is *substantially, though not in form, against the state,* and the court ought not to proceed without making the state a party. If this cannot be done, the court cannot take jurisdiction of the cause."

" The full pressure of this argument," (says the Chief Justice,) " is felt, and the difficulties it presents are acknowledged. *The direct interest of the state in the suit, as brought, is admitted ;* and, had it been in the power of the bank to make it a party, *perhaps* no decree in the cause ought to have been pronounced, until the state was before the court. But this was not in the power of the bank. The eleventh amendment of the constitution has exempted a state from the suits of citizens of other states, or aliens; and the very difficult question is to be decided, whether, in such a case, the court may act upon the agents of the state, and on the property in their hands."

" The state of Ohio denies the existence of this power, and contends, that no preventive proceedings whatever, or proceedings against the very property which may have been seized by the agent of a state, can be sustained against such agent, because they would be substantially against the state itself, in violation of the eleventh amendment of the constitution."

" The appellants admit, that the jurisdiction of the court is not ousted by any incidental or consequential interest which a state may have in the decision to be made,

but is to be considered as a party when the decision acts directly and immediately upon the state, through its officers."

" If this question were to be determined on the authority of English decisions, it is believed that no case can be adduced, where any person has been considered as a party, who is not made so in the record."

After citing many instances to show that the circuit courts of the United States would exercise jurisdiction in cases where a state had a real interest, notwithstanding the inhibition contained in the eleventh amendment of the constitution, the Chief Justice thus states the opinion of the court: " It may, we think, be laid down as a rule which admits of no exception, that, in all cases where jurisdiction depends on the party, it is the party named in the record."

I think this case furnishes an unanswerable argument to the objection taken by the defendants to the jurisdiction of the Court, grounded on the allegation that the state is substantially the party in interest. For, if the Circuit Court of the United States, notwithstanding the positive restriction contained in the amendment referred to, could assume jurisdiction in a case where a state had a direct and immediate interest in the event of the suit, I know of no reason why a court of chancery may not, in a proper case, exercise a like jurisdiction where the restraint is imposed, not by the constitution or a positive law, but by the general principles of the public or municipal law. If, in the case from which I have freely quoted, the Circuit Court of the United States, upon the facts disclosed in the bill, could interpose, by injunction, and finally decree restitution of money in the actual custody of the treasurer of the state of Ohio, I know of no reason why the Court of Chancery in this state might not exercise jurisdiction in the present case, and grant the relief prayed for, if

warranted by the facts stated in the bill, and which are admitted by the demurrer.

In the case last cited, the appellants claimed, also, that the appeal ought to be dismissed, because the case made in the bill did not warrant the interference of a court of chancery. "In examining this question," the Chief Justice remarks, " it is proper that the Court should consider the real case and its actual circumstances. The original bill prays for an injunction against Ralph Osborn, auditor of the state of Ohio, to restrain him from executing a law of that state, to the great oppression and injury of the complainants, and to the destruction of rights and privileges conferred upon them by their charter, and by the constitution of the United States. The true inquiry is, whether an injunction can be issued to restrain a person, *who is a state officer*, from performing any official act enjoined by statute, and whether a court of equity can decree restitution, if the act be performed. In pursuing this inquiry, it must be assumed, for the present, that the act is unconstitutional, and furnishes no authority or protection to the officer who is about to proceed under it. This must be assumed, because, in the arrangement of his argument, the counsel who opened the cause, has chosen to reserve that point for the last, and to contend that, *though the law be void*, no case is made out against the defendants. We suspend, also, the consideration of the question, whether the interest of the state of Ohio, as disclosed in the bill, shows a want of jurisdiction in the Circuit Court, which ought to have arrested its proceedings." " The sole inquiry, for the present, is, whether, stripping the case of these objections, the plaintiffs below were entitled to relief in a court of equity, against the defendants, and to the protection of an injunction. The appellants expressly waive the extravagant proposition that a void act can afford protection to the person who executes

it, and admit the liability of the defendants to the plain-
tiffs, to the extent of the injury sustained, in an action at
law.    The question, then, is reduced to the single inquiry,
whether the case is cognizable in a court of equity."    Af-
ter reviewing the facts of the case, and the causes which
justify courts of equity in interposing their authority for the
protection of private rights, the Chief Justice proceeds to
consider the objection made by the defendants in the court
below, grounded on the fact that the party interested was
not before the court, and that, therefore, the court could
make no decree.    Upon this point he says :    " If the state
of Ohio could have been made a party defendant, it can
scarcely be denied, that this would be a strong case for an
injunction.    The objection is, that, as the real party can-
not be brought before the court, a suit cannot be sustained
against the agents of that party; and cases have been
cited to show that a court of chancery will not make a
decree, unless all those who are substantially interested, be
made parties to the suit."

" This is certainly true, where it is in the power of the
plaintiff to make them parties ; but if the person who is
*the real principal, the person who is the true source of the*
mischief, by whose power and for whose advantage it is
done, be himself above the law, be exempt from all judi-
cial process, it would be subversive of the best establish-
ed principles, to say that the laws could not afford the
same remedies against the agent employed in doing the
wrong, which they would afford against him, could his
principal be joined in the suit.    It is admitted, that the
privilege of the principal is not communicated to the agent;
for the appellants acknowledge that an action at law would
lie against the agent, in which full compensation ought to
be made for the injury.    It being admitted, then, that the
agent is not privileged by his connection with his principal,
that he is responsible for his own act, to the full extent of

the injury, why should not the preventive power of the court also be applied to him? Why may it not restrain him from the commission of a wrong, which it would punish him for committing? We put out of view the character of the principal as a sovereign state, because that is made a distinct point, and consider the question singly as respects the want of parties. Now, if the party before the Court would be responsible for the whole injury, why may he not be restrained from its commission, *if no other party can be brought before the Court?*" Again, " Will it be said, that the action of trespass is the only remedy given for this injury? Can it be denied, that an action on the case, for money had and received to the plaintiffs use, might be maintained? We think it cannot; and if such an action might be maintained, no plausible reason suggests itself to us, for the opinion, that an injunction may not be awarded to restrain the agent with as much propriety as it might be awarded to restrain the principal, could the principal be made a party."

This opinion establishes the following propositions :

(1.) That the rule which prohibits a court of chancery from making a decree, until all those who are substantially interested, be made parties to the suit, is inapplicable to a case, when it is not in the power of the complainant to make them parties.

(2.) If, in such a case, the defendant be a mere agent, and not privileged by his connection with his principal, and would be responsible in a court of law for the whole injury, the preventive power of a court of chancery may be applied to him in a proper case.

(3.) That if an action of trespass would have lain against the defendants in that case, then case would also lie for money had and received.

And with respect to the circumstances which would

authorize an injunction, the Chief Justice decides, that it will issue :

(1.) To restrain an agent from paying over to his principal, if that principal would not be amenable to the law.

(2.) In cases where the agent could not make compensation for the injury.

(3.) In cases where the injury would be irreparable.

Applying to the case before them, these principles, the Supreme Court of the United States determined that, as the defendants took and held the money in controversy, without authority, and would be liable for the whole amount in an action at law, the remedy by bill in equity was apt and proper ; and decreed restitution.

Believing then, that the case of *Osborn* v. *The Bank of the United States* establishes incontrovertibly the right of the court of chancery to take jurisdiction of the present case, notwithstanding the state is a party in interest ; and that its jurisdiction is not ousted for the reason that the state is not, and cannot be made a party ; it only remains for us to determine, whether, in the exercise of its jurisdiction, the Court ought to make a decree against the defendants.    This brings me to an examination of the *merits* of the case.

3. Whether the complainants are entitled to relief, must depend upon the facts stated in the bill, and which are admitted by the demurrer.    These facts are somewhat complicated, and it would savor of affectation not to admit that the law arising upon the facts is involved in some obscurity, arising, principally, from the misapplication of well established general principles, by elementary writers, and in adjudged cases.

To proceed understandingly, it becomes necessary to examine and determine, with accuracy, the true legal import of the agreement entered into between the complainants and the commissioners or agents appointed by the

state, to effect a settlement with the Michigan State Bank, in order to define the legal rights of the parties to that agreement.   By referring to the indenture, it appears that the bank, for the purpose of settling with the state, assigned to Eurotas P. Hastings, Auditor General, Robert Stuart, State Treasurer, and Thomas Rowland, Secretary of State, all the interest in and to the property, real estate, choses in action, &c. mentioned and set forth in a schedule annexed to the indenture, and constituted the said Hastings, Stuart and Rowland, or such other persons as the legislature might appoint, their attornies, to sell, convey, alien, lease, assign, collect, secure, commute and compromise the property and demands in the said schedule described, in their own names or in the name of the bank, ratifying and confirming all their lawful acts and doings.   The bank also covenanted with the said commissioners, to grant to them, their agent or attorney, access to such books and papers connected with the property and demands aforesaid as might be in their possession, &c.

In consideration of which, the commissioners on their part agreed to receive the said property mentioned in the schedule annexed to said assignment, in full payment and satisfaction of all debts and liabilities of the bank to the state, and did, in and by said indenture, acquit and discharge the bank from all claims, debts, dues and demands against them and in favor of the state, and from all liability thereon.   The following clause then appears in the indenture:  " And it is hereby understood by and between the parties of the first and second part, that the assignment of the property and effects contained in said schedule A, is made upon and subject to the express condition, that the state of Michigan shall indemnify and save harmless the party of the first part and their grantors, immediate and remote, from and against the claims and liabilities

herein after specified, forever, viz: a certain bond and mortgage executed by the party of the first part, to the Bank of Michigan, upon their banking house and lot, this day conveyed by the party of the first part, to the Auditor General, subject to said mortgage, upon which there remains unpaid the principal sum of $11,210; also, a certain bond and mortgage executed by Lansing B. Mizner to James H. Wood, dated October 19, 1838, on a house and lot this day conveyed by the party of the first part, to the Auditor General, subject to said mortgage, upon which the principal sum of $1,500 remains unpaid; also, a certain bond and mortgage, executed by Eurotas P. Hastings to William W. Miller, upon lots eight, nine, fifty-four, and fifty-five, in section four in the city of Detroit, this day conveyed by the party of the first part, to the Auditor General, upon which the principal sum of $10,000 remains unpaid; also, all and sundry claims by and in favor of attornies and agents, for professional services and disbursements, in and about the collection and securing of all or any of the demands set forth in said schedule A, which have accrued, or may hereafter accrue, upon any collateral securities transferred to the state of Michigan, and more particularly set forth in schedule B, hereunto annexed." Such was the agreement between the bank and the commissioners appointed by the state. That agreement may, in short, be thus stated. In consideration of a debt of $500,000, which the complainants acknowledge to be due by them to the state of Michigan, they actually assigned and conveyed to the defendants, the agents of the state, property appraised at the sum of over $600,000; but the assignment and conveyance was made by the complainants, upon *the express condition,* that the state should indemnify and save harmless the bank from certain liabilities, &c. expressed in the condition.

Waiving the consideration of the question, as to the

authority of the commissioners, to make the agreement, it purports, on its face, to be an assignment, by the complainants, to the defendants, of certain real estate and choses in action, founded on a valuable consideration; but subject to a certain condition.    What then is a condition, and what are its legal effects?    Estates upon condition are such as have a qualification annexed to them, by which they may, upon the happening of a particular event, be created, or enlarged, or destroyed.    3 Kent Com. 120; Co. Litt. 201.    The following definition is more full and satisfactory.    "A condition is a restriction, or a qualification, annexed to a conveyance of lands, whereby it is provided that in case a particular event does or does not happen, or in case the grantee does or omits to do a particular act, an estate shall commence, be enlarged, or defeated."    2 Cruise's Dig. 2.    Littleton divides them into two classes.    1. Estates upon condition implied, or in law; and 2. Estates upon condition express or in deed.    Litt. § 325.    The condition in the case before us belongs to the second class, and is a condition express, or in deed.    The right to annex a condition to a conveyance, results from the power of alienation; and this power of alienation is an incident to the right of property.    If then, that condition be precedent, and the act upon which the estate depends be not performed, the estate does not vest; but if the condition be subsequent, the estate does vest, and will continue to vest until defeated by a failure on the part of the grantee to perform the condition annexed to the estate; or, in other words, until there is a breach of the condition. If, for instance, a person have an estate in fee subject to a condition, he may convey or devise the same, and the grantee or devisee will continue to hold as though no qualification had been annexed; but until the condition be performed, the estate is liable to be defeated; unless, indeed, the performance of the condition become impossible, by

the act of God, or of the individual who imposes it.  "For if a condition annexed to lands be possible at the making of the condition, and become impossible by the act of God, yet, the estate of the feoffee shall not be avoided." Co. Litt. § 334.  " And so it is in case of a feoffment in fee with a condition subsequent that is impossible; the estate of the feoffee is absolute.   And he that entereth for a condition broken shall be seized in his first estate, or of that estate which he had at the time of the estate made upon condition."   Co. Litt. § 325.

Having shown, 1. That there was in this case a condition subsequent annexed to the estate ; and, 2. The effect of a breach of such condition ; it only remains for me to inquire, whether there has been a breach of the condition annexed to the estate granted by the complainants to the defendants, and if so, whether the facts stated in the bill will warrant a court of equity in granting the relief prayed for ; or, if there has been no actual breach of the condition, whether, under all the circumstances, a court of equity should hold the estate in the hands of the defendants, subject to the payment of the debts mentioned in the condition.

But before entering upon the discussion of this branch of the case, it may not be considered unimportant to refer to a few adjudged cases, to show how inflexibly courts have adhered to the principle laid down by elementary writers, that upon breach of a condition, the estate, whether real or personal, reverts to him by whom the condition was annexed.

A and B, tenants in common of land, sold the wood growing thereon, with a proviso that it should be taken from the land within two years.   B then conveyed his interest in the land to A.   The purchaser of the wood transferred his right thereto to C, who had no notice of the proviso as to the time of taking it away.   C cut the wood,

but did not remove it within two years. Held, that the property in the wood reverted to A, and that C could not recover of him pay therefor, nor pay for cutting it. 1 Metc. R. 271.

S and D entered into a written contract, by which the former agreed to sell, and the latter to purchase, a canal boat for $300, provided that amount should be paid by D in freighting wheat and flour on the canal under the direction of S. Held a conditional sale, and that no property vested in D, which could be sold under a fi. fa. against him, until the purchase money was fully paid. Under a bona fide contract of this nature, the vendee is entitled to the possession of the thing sold for the purpose of paying for it in the manner stipulated ; but it is to be thus possessed as the property of the vendor until the condition of payment is fulfilled. 2 Hill's R. 326. Chief Justice *Nelson*, in delivering the opinion of the Court says : "The right of Dubois rested in contract and contract only, by virtue of which, he might, at a future day, acquire an interest in the property, but till the fulfilment of the condition, or payment of the purchase money, in the mode pointed out by the contract, nothing passed." The same doctrine is fully sustained by Mr. Justice *Story*, in the case of *De Wolf* v. *Babbitt*, 4 Mason R. 289, and by Mr. Justice *Washington*, in the case of *Copeland* v. *Bosquet*, 4 Wash. C. C. R. 593. See also the case of *Lawrence* v. *Gifford*, 17 Pick. R. 366, and the case of *Haggerty* v. *Palmer*, 6 John. Ch. R. 433.

In the case last cited, it appeared that goods were sold in the city of New York, to be paid for in approved endorsed notes, and it was the usage in that city when goods were sold, for the vendor to deliver them to the buyer when called for, and to send for the notes. The vendee, after he had received the goods, and before he was called upon for the notes, according to the terms of the sale,

stopped payment and assigned over the goods, with other property, to pay certain creditors.   Held, by *Kent*, Chancellor, that the delivery of the goods by the vendors, was conditional;—that the vendee was a trustee for them until the notes were delivered;—and that the assignment by the vendee was voluntary and fraudulent, and did not defeat the equitable lien of the vendors.   In *Hussey* v. *Thornton*, 4 Mass. R. 405, it was held, that if A contracts to sell certain goods to B, on a credit, with a condition that B shall furnish a surety for the price, and delivers the goods without such surety furnished, but declaring that he should not consider them sold until the security should be given, the property remains in A, notwithstanding such delivery. These cases contain a full and ample recognition of the rule laid down in 2 Kent's Com. 497.   I now refer to the case of *Gray* v. *Blanchard*, 8 Pick. R. 284, to show the strictness of the principle where conditions are annexed to a conveyance of real estate.   " The demandant, being owner of a parcel of land with a dwelling house thereon, adjoining, on the north, to land with a dwelling house thereon belonging to his sister, facing to the south, conveyed to the tenant's grantor in fee simple, ' provided, however, this conveyance is upon the condition, that no windows shall be placed in the north wall of the house aforesaid, or of any house to be erected on the premises, within thirty years from the date hereof.'   After the sister has conveyed her land to a stranger, the tenant mortgages by deed reciting the foregoing provision, and afterward, while remaining in possession, makes windows in the north wall. Held, that the above clause was a condition, and that such breach of it worked a forfeiture of the estate, and gave the demandant a right to re-enter."   The decisions are all based upon the general rule, "that when a man hath a thing, he may condition with it as he will ;" and the duty of courts is to expound and give effect to all lawful contracts

made between parties, and not to make contracts for them.

The question now recurs, has there been a breach of the condition annexed to the estate granted by the complainants to the defendants, for the use of the state ? The bill alledges that the state has never paid, or in any way satisfied the bond and mortgage executed by the complainants to the Bank of Michigan, but has permitted the mortgage to be foreclosed, and the banking house to be sold at a very great sacrifice, and much below its real value, and has refused to pay off and satisfy the balance of several thousand dollars due upon the said bond and mortgage, and that the complainants are threatened with a suit upon the said bond for the balance due thereon, by the owner thereof, which bond the state was bound and obliged to have paid long since ; that the state is insol-' vent, &c.; and that they have, without avail, endeavored to induce the state to comply with the terms of the agreement entered into as aforesaid.  I have already said that the words in the last clause of the agreement, import a condition ;—a condition imposed by the grantors.  But the clause also imports a covenant or agreement on the part of the state to indemnify.  Suppose, therefore, that no words had been employed creating a condition, could the complainants, in a court of law, upon proof of the facts stated in the bill, have maintained an action upon the covenant ? I apprehend that they could not, for the reason that the facts proved would not establish a breach of the covenant ; and, at law, there can be no damages without an injury.  The mere allegation that the complainants are threatened with a suit at law upon the bond, to recover the balance that may be due on it, would be insufficient to justify a recovery.  In other words, a party cannot recover upon a covenant, or bond to indemnify, unless he has been actually damnified.  *There being then no actual*

*breach of the condition* by the state, the complainants could not sustain a suit at law, and for the same reason, the property assigned to the defendants does not revert to the complainants. " Conditions subsequent, (says Chancellor *Kent,* 4 Com. 129,) are not favored in law, and are construed strictly, because they tend to destroy estates ; and the rigorous exaction of them is a species of *summum jus,* and in many cases hardly reconcilable with conscience." See also Co. Litt. 205, b. 219, b. and 8 Co. 90, b. I do not of course mean to be understood as saying, that the exaction, in this case, would be unconscientious. Admitting, however, that there had been a breach of the condition on the part of the state, a court of equity would not lend its aid to divest an estate for the breach of a condition subsequent, although that aid will sometimes be extended to *relieve* against such a condition. 4 Kent's Com. 130. It is to be observed here, that the agreement on the part of the state, was not to *pay,* as is supposed in that portion of the bill last quoted. The allegation is, " that the state has refused to *pay and satisfy* the balance of several thousand dollars," &c. " which the state was bound and obliged to pay," &c.; but the agreement was simply to *indemnify.* If the agreement on the part of the state had been to *pay,* the case would have been stripped of many of the difficulties by which it is surrounded.

It follows, therefore, that if the complainants are entitled to any relief, that relief must be founded upon other facts disclosed in the bill, and not upon the ground that there has been a breach, on the part of the state, of the last clause in the indenture. It is claimed that a court of equity has jurisdiction of the case, and power to grant the relief prayed for, on two distinct grounds.

(1.) It is contended that the vendor of land has a lien on the land for the amount of the purchase money, not only against the vendor himself, his heirs, and other privies in

estate, but also against subsequent purchasers, having notice that the purchase money remains unpaid.

(2.) That the Court will compel a specific performance of a contract to indemnify and save harmless, although no damages have actually been sustained.

No principle is now better settled than that the vendee of lands, becomes a trustee to the vendor for the purchase money, or so much as remains unpaid. 2 Story on Eq. 463, '4, '5. In such a case the trust is implied, and arises from what are called equitable liens, of which courts of equity alone take cognizance. Such liens exist independently of any express agreement, and courts of equity enforce them, on the principle that a person having gotten the estate of another, ought not in conscience, as between them, to be allowed to keep it, and not pay the consideration money. The Roman law declared the lien to exist in natural justice; and this principle, which is now engrafted in the equity jurisprudence, both of England and this country, was borrowed from the civil law. By that law, the rule was equally applied to the sale of movable and of immovable property. 2 Story on Eq. 408. In England, however, the lien is usually confined to cases of the sale of immovables, and does not extend to movables where there has been a transfer of possession. It is insisted that an equitable lien exists in this case, for the reason that the covenant on the part of the state to indemnify, constituted part of the consideration for the sale by the complainants of the property mentioned in the assignment. Admit this to be true, yet it is difficult to perceive how a lien can exist before a breach of the covenant to indemnify. It may be that a recovery cannot be had against the bank by the person holding the bond, and if so, it is quite clear that no lien would exist. Whether a lien exists, then, must depend upon a contingency which may never happen. We are not to presume that a suit will be insti-

tuted on the bond; much less are we to presume that a recovery will be had. It will be time enough to enforce a lien, when that lien attaches, and it certainly cannot attach in the present case, unless the complainants are damnified. Equity will not *raise* a debt against the agreement of the parties, which agreement did not contemplate a debt or obligation until the complainants were damnified. The debt being *raised,* equity might direct the property assigned to the defendants to be held as security for its payment; or, in other words, consider the debt due by the *vendee,* as a debt due by the *property.* Courts of equity have applied the doctrine of equitable liens with great liberality, but I have in vain sought for a case which would justify the application of the principle to the present case. The whole argument of the complainants, is based upon facts that are assumed, and not upon facts as they actually exist. There is no agreement on the part of the state to *pay and satisfy* the bonds and mortgages mentioned in the last clause of the indenture, but simply an agreement to *indemnify.* The legal liability of a covenantor in the first case depends upon no contingency,—in the latter case it does. This distinction is obvious, and is recognized in all the adjudged cases on the subject. I shall forbear entering into an examination of those cases, as they have been fully considered in the opinion delivered by my brother *Goodwin,* in the case of *Wheelock* v. *Rice.** An equitable lien, therefore, does not exist, upon the facts disclosed in the bill of complaint in this cause.

But, secondly, can the Court enforce the agreement to indemnify ? It is well settled that " courts of equity will decree the specific performance of a general covenant to indemnify, although it sounds only in damages, upon the same principle, that the court entertains bills *quia timet.*"

* Vide Post.

2 Story's Com. on Eq. 145. The leading case in this country which asserts and indicates the jurisdiction of courts of equity in such cases, is *Champion* v. *Brown*, 6 John. Ch. R. 406. This case the counsel for the complainants considers directly in point, and as justifying the relief asked for in the present instance. Let us see how this view is sustained by the case. The bill was filed by Henry Champion and William L. Storrs, and the administrators and heirs of John Paddock, deceased, against John Brown and Jacob Brown, for the specific performance of an agreement, made on the 29th of August, 1816, by which Henry Champion and Lemuel Storrs agreed to sell and convey to Paddock 952 acres of land, for the sum of $8000 ; $500 to be paid in cash, and the residue in six equal annual instalments, with interest annually. Paddock died intestate, November 16, 1816, and his administrators and heirs, being unable to perform the contract, for want of personal assets, on the 1st of June, 1818, entered into an agreement with the defendants, by which the latter covenanted and agreed, " *that they would take up and cancel*" the contract made between Champion and Storrs, and Paddock, &c. by the 1st of August then next, or, in case that Champion, the survivor of Lemuel Storrs, should refuse to give up and cancel the said contract, then the defendants covenanted to *indemnify and save harmless* the administrators of Paddock, &c. from all damages, costs, charges and expenses which they might sustain, or be put to, on account of the claims, covenants and agreements in the said agreement contained. The administrators of Paddock covenanted, in their individual capacities, *to pay to the defendants all the moneys owing to them* from J. Paddock, deceased. Lemuel Storrs having died, all his interest in the contract became vested in William L. Storrs, one of the complainants. Soon after the agreement between the administrators of Paddock and the defendants, the latter

entered into possession of the land, &c.   The bill prayed for a discovery, and that the defendants might be decreed specifically to perform the agreement between Champion and Storrs and Paddock, and for their indemnity ; the heirs offering to ratify and confirm the conveyance of the land to the defendants in fee, &c.   The Chancellor, in giving his opinion, said, that the first and leading question was, whether the bill could be sustained by Champion and Storrs, as vendors, against the defendants, claiming by purchase under the vendee.   The Chancellor decided this question in the affirmative, and that the plaintiffs had a lien on the land for the purchase money.   The next question was, whether the plaintiffs, who were administrators of Paddock, were entitled to any remedy, under the bill, upon the covenant of indemnity.   In considering this question, the Chancellor remarked, that the administrators were not personally liable on the contract of their intestate; and, as they had averred they had no assets, it was not perceived how they could be injured, and that this assertion of theirs created the great difficulty on the point; and, after citing several cases to show that equity will decree the performance of a general covenant of indemnity, though it sounds only in damages, upon the principle on which the court entertains bills *quia timet*, he further remarked, that in the case before him, the defendants, by their covenant of indemnity, and purchase of the contract between Champion and Storrs and Paddock, undertook to relieve the estate of Paddock from the burden of that contract.   This, said the Chancellor, is the true intent and meaning of the agreement between the administrators and the defendants, and it is as just that they should be decreed to clear the representatives of Paddock, from the charge *which they assumed for them*, as it is that a principal debtor should exonerate his surety before suit brought, and not leave a cloud always hanging over him.   After

a very critical examination of the whole agreement be-
tween the administrators and the defendants, the Chan-
cellor seems to have arrived at the following conclusion:
" That the defendants intended to stand in the place of
Paddock, (the original vendee,) and to assume the pay-
ments to Champion and Storrs, with which the estate of
Paddock stood charged ;"—that " this was the good sense
and meaning of this covenant of indemnity." A decree was
accordingly made that the administrators were entitled to
a specific performance of the covenants on the part of the
defendants, and to an assessment of damages for breach
thereof.

The leading English case relied upon by the Chancellor
in support of his views, is *Ranelaugh* v. *Hays*, 1 Vern. 189.
The facts in that case were as follows: "The Earl of
Ranelaugh assigned several shares of the excise in Ire-
land, to Sir James Hays, and Sir James covenanted to
save the Earl harmless in respect of that assignment, and
to stand in his place touching the payments to the King, and
other matters that were to be performed by him." The
plaintiff suggested in the bill, that he had been sued by
the King for £20,000, and that the defendant ought to have
paid it, &c. The Lord Keeper decreed that Sir James
should perform his covenant, and that a master should re-
port as often as a breach occurred, that the court might,
if there should be occasion, direct a trial at law in a *quan-
tum damnificatus.* The Lord Keeper compared it to the
case of a counter-bond; where, although the *surety* is not
troubled, yet at any time after the money became payable
on the original bond, a court of equity will decree the
principal to pay the debt.

These two cases, although differing in respect to the
facts, were deemed to be governed by the same princi-
ples, and instead of supporting the views of the counsel
by whom they were cited, go very far, I think, to show,

that the present case does not fall within the principles laid down either by the Lord Keeper or Chancellor Kent. In the case of *Champion* v. *Brown*, the Chancellor says, "*that the defendants intended to stand in the place of Paddock, and to assume the payments to Champion and Storrs, with which the estate of Paddock stood charged*," and that "*such was the good sense and meaning of the covenant of indemnity*." The case of *Ranelaugh* v. *Hays*, states that "*Hays was to stand in the place of the plaintiff, touching the payments to the King*." The covenants in those cases, we are bound to presume, justified the construction put upon them; if so, it would be difficult to perceive, why, upon principle, the complainants were not entitled to the relief given them. But does the covenant in this case authorize us in saying, *that the state intended to stand in the place of the bank, and assume the payments of the several bonds, &c. mentioned in the condition to the indenture?* or *that the state by the terms of the covenant was to stand in the place of the bank, touching the payments to the Bank of Michigan or holders of the bonds?* I know of no rule that would justify me in putting such a construction upon the covenant in this case. We are not permitted to make a contract for the parties, by declaring that a *covenant to indemnify* means a *covenant to pay*. If the language of the covenant, taken in connexion with the whole agreement, would warrant such a construction, we should feel bound so to construe it; but the language is plain: it admits of but one construction; and we cannot without doing violence to the rules of law, give effect to what might have been the intention of the parties. We must judge of that intention by the agreement itself. But if we could so construe the indenture as to intend that in point of fact the covenant to *indemnify* meant a covenant to *pay*, as was the case in *Champion* v. *Brown*, and *Ranelaugh* v. *Hays*, insuperable difficulties would be interposed in the way of granting the relief sought for. What in such

a case is the mode of relief, and the measure of damages? The mode of relief is by a proceeding directly against the party who enters into the covenant. That party in the present case is the state, who is not and cannot be made a party to the suit. The measure of damages, to be ascertained by a trial at law in a *quantum damnificatus*, would be the actual injury growing out of a breach of the covenant. How can such a trial be had without the proper parties? Again, it may be well doubted, whether in point of law, there is such a covenant on the part of the state as would authorize its enforcement in a court of equity. I have treated the case, thus far, as though the covenant was not inserted in the indenture as a *condition* annexed to the estate. I have considered it as though it did not, of itself, constitute the condition; and it may be questionable, whether, had it been a covenant to *pay*, instead of a covenant to indemnify, a court of equity would decree a specific performance. But the question does not necessarily arise, and no decision, therefore, is called for on this point.

It was urged in argument, that the state had, by a solemn legislative act, rejected the condition, and it was asked with emphasis, whether the state could thus reject the condition and still hold the property? The answer is, that the state cannot reject the condition, and hold the property; and that a breach of the condition will make a forfeiture of the estate granted. But the declaration of the state, that it rejects the condition, does not, of itself, constitute a breach of that condition, any more than the declaration of an individual who had executed a bond conditioned for the performance of covenants, that he rejected the condition, would constitute a breach of such condition. It is not in the power of a legislature to convert, by a legislative enactment, a conditional estate, into an absolute one. Such an act would involve a violation of the constitution

of the United States, and be pronounced nugatory and void. If a breach of the condition on the part of the state had been shown in the bill, I should have felt bound to treat the act directing the monies arising from the sale of the assigned assets, to be appropriated towards the redemption of state scrip, as a violation of the vested rights of the complainants, and should have disregarded its provisions. For, a breach of condition once established, the state is devested of all right to that property; it would at once revert to the complainants, and any act of the legislature appropriating that property to a public use, in a manner not recognized by the constitution or laws of the state, would be void.

Viewing the case in the light I do, it has become unnecessary to decide some questions raised by counsel in argument, and involving principles of vital interest.

One point, however, may need a passing notice : I refer to the position assumed by counsel, that the legislature had a right to reject the condition annexed to the indenture, in the event that the commissioners exceeded their authority by agreeing to the condition. Whether there was an excess of power, or not, it is unnecessary to determine, and can have no influence on the ultimate decision of the rights of the defendants under the agreement. They had, as I have already intimated, the right to annex the condition. The state had the right, if there was no authority on the part of the commissioners, to repudiate their acts. This the state did not do. By acting for nearly two years upon the agreement,—by exercising acts of ownership over the property, they affirmed the acts of their agents, whether those acts were originally binding and obligatory or not. But the act of 17th February, 1842, was a solemn act of recognition,—one from which the state cannot escape. That part of the act rejecting the condition, was a nullity; it is a declaration without any

meaning.   If it would not be competent for an individual to separate an estate from the condition annexed to it, it would not be competent for the state to do so.   What would be the effect of such an act?   It would be to separate two things which in their nature are inseparable.   In the language of the law, the condition is annexed to the estate; it doth always attend and wait upon the estate ; it is knit to it.   For this Court, then, to affirm that such a power is lodged in the legislature, would be to affirm that that clause in the constitution, which prohibits a legislature from passing an act impairing the obligation of contracts, is a mere nullity.

The conclusion, then, of my mind is,

(1.)  That the estate granted by the complainants to the defendants, was upon condition.

(2.)  That whether the commissioners on the part of the state had the authority or not to annex the condition, cannot affect the legal rights of the complainants under the agreement ; for the reason,

(3.)  That the state has ratified and affirmed the acts of the commissioners, and is bound by the agreement made with the complainant.

(4.)  That the condition in the last clause of the agreement was simply to indemnify.

(5.)  That there has been no breach by the state of that condition ; and

(6.)  That that part of the act of 17th February, 1842, which rejects the condition, is a mere nullity, and of no efficacy in the law.

The decree of the Chancellor must be affirmed.

GOODWIN, J. did not participate in the decision, the cause having been argued before he took his seat upon the bench.

*Decree affirmed.*