Mr. Chief Justice Sharkey
delivered the opinion of the court.
This was an information in the nature of a quo warranto, instituted in the circuit court of Adams county, against the Commercial Bank of Natchez, to have a forfeiture of its charter judicially declared, for alleged violations.
The bank pleaded its charter, to which plea the district attor* ney filed twelve replications, on some of which the bank took issue, and demurred to others. The demurrer to the seventh replication was sustained, but the demurrers to the firs't, fifth, eighth and twelfth, were overruled, and the bank rejoined. To these rejoinders the district attorney demurred, and these demurrers were sustained, and judgment rendered against the bank. As the issues of fact were not tried, the case comes up on the questions raised by the demurrers to the pleadings.
The points which arise out of the state of case, as it is pre *612 sented by the pleadings, are ranged under five distinct heads, and will be considered in the order they were discussed. The first relates to the manner the stock was taken under the charter, the first section of which contains a proviso that no person, firm, or corporation, should on any one day, subscribe, directly or indirectly, or procure any other person to subscribe for stock, with the understanding that it should be transferred after the books were closed, for more than fifty shares. The first replication avers, that at the time subscriptions for stock were in progress and being received, to wit, oh the 15th of March, 1836, divers persons did, within one and the same day, to wit, on the day aforesaid, subscribe each for more than fifty shares of the stock of said bank, indirectly, by procuring other persons to subscribe for certain shares, with the understanding between them that the stock so subscribed for, should be transferred to. the persons obtaining such subscriptions to be made, which stock was so transferred. To this replication the defendant demurred for special causes, amongst others, that it was uncertain. On the overruling of the demurrer, there was a rejoinder of general denial. The first ground relied on. for a reversal is that the demurrer was improperly overruled, because if the charge were even well pleaded, the fact pleaded did not amount to a forfeiture of the charter.
It is necessary to premise that the act incorporating the bank, directed that books should be opened for subscriptions to the capital stock, on a certain day, under the superintendence of eight commissioners named in the act. The second Monday of March, 1836, was the day appointed; the indirect subscriptions are charged to have occurred on the 15th of March, 1836, which was the day of opening the books. This provision of the act was entirely directory to the superintendents or commissioners. If any violation of the act occurred, it was whilst the whole matter was under their supervision. Admitting, then, that such indirect subscriptions were made, they preceded the existence of the corporation. It cannot be held responsible for violations of law committed by the agents of the state, before it had a corporate existence. No right can be forfeited until it has been ac *613 quired. By the failure to perform conditions precedent, a right may be defeated, or prevented from vesting, but it is not forfeited except for the non-performance of conditions subsequent. The second section declares that “ as soon as the sum of $500,000 shall be subscribed, the subscribers, their successors and assigns, shall be a body politic and corporate by the name,” <fcc. The sixth section provided, that so soon as the sum of $300,000 was subscribed, the superintendents should, by giving ten days’ notice, convene the subscribers for the purpose of electing directors. Suppose the requisite sum had not been subscribed, there would not have been a corporation. It was not the act of the legislature, then, that created the corporation by virtue of its own immediate operative force. The corporation originated with the act, it is true, but a certain contingency was to happen — a certain amount of stock was to be subscribed before the act professed to give vitality to the artificial person.
he persons who might subscribe after the passage of the act, were to constitute the corporation after they had subscribed a given amount. The case cited from 4 Paige’s Reports, is a direct authority on this point, if any were necessary. It also decides, that the superintendents are the agents of the state, and not of the corporation; and this is manifestly so, since they derive their power from the act, and their appointment is made by it, and their duties defined. A corporation can have no agents tintil it has existence. Bona fide subscribers cannot be affected by irregularities which occurred under these agents of the state. A question, similar in its character, was raised in the case of Minor v. The Merchants Bank of Alexandria, 1 Peters R. 46. Fraud and collusion between the commissioners and original subscribers, were set up as a defence to the right of action, on the ground of violation of a condition precedent to the legal existence of the corporation. After having adverted to the provisions of the charter, for the purpose of showing that such irregularities did not vitiate the subscription, Judge Story remarked, “ that it would be extremely difficult to maintain, upon general principles of law, that a private fraud between the original subscribers and commissioners,. could be permitted to be set up, to *614 the injury of subsequent purchasers of stock, who became bona fide holders, without any participation or notice of the fraud." The case cited from 4 Paige’s Ch. Reports, decides that such indirect subscriptions, made through third persons, do not affect the corporate rights, and can be vacated only by a person interested, who has been thereby deprived of the privilege of taking stock. See also Angell & Ames, 88, 89. It seems to me to be clear then, both on reason and authority, that these indirect subscriptions, in violation of the directions given by the state to its own agents, do not constitute a cause of forfeiture. The corporation did not then exist.
But there is another view in which the subject-matter of this replication has been presented, that requires to be noticed. It is said that the taking of stock, in strict accordance with the charter, was a condition precedent to the legal existence of the corporation, and that inasmuch as the stock was subscribed improperly, the corporation had not such legal existence, but that it has usurped authority. It is no doubt true that conditions precedent, prescribed by. the charter, must be performed before the corporation can go into operation ; but it is also true that the stale may waive the performance of such conditions, and give existence to the corporation, just as it'may waive a forfeiture for a breach of conditions subsequent. Or, by its own acts or admissions, made through its officers, it may be estopped from asserting the non-performance of conditions precedent; and such, I think, is its present attitude. It is a familiar rule that any confession or admission, or any allegation, made in pleading, will preclude the party from afterwards contesting the same fact in the same suit. A defendant cannot be sued in one character, and held responsible in another. The affidavit of the relator, which is the foundation of the information, charges the plaintiff in error as “ the Commercial Bank of Natchez, an incorporated bank of the state, aforesaid," &c.; the information is against the Commercial Bank of Natchez; and so is the subpoena. The subsequent pleadings conform in this respect to the affidavit and process. After these admissions, the corporate existence cannot be questioned. The rem *615 edy now pursued would be equally proper in case authority had. been usurped without any act of incorporation, or in case the privileges granted had been exercised without performing conditions precedent; but for such usurpations the proceeding must be against the individuals who have committed the offence; whereas, when the proceeding is instituted for a forfeiture of charter, it must be against the corporation. This subject was very fully discussed in the case cited from 15 Wend. 113, and, after reviewing the previous decisions in New York on the subject, the rule is there laid down as stated, that if the proceeding be against a corporation as such, the performance of conditions precedent cannot be inquired into ; the existence of the corporation is admitted. Other authorities give the same rule. Wilcox on Corp. 500; 4 Mod. 58. The replication, then, being against the corporation, was defective in substance in not alleging a good cause of forfeiture. It was not a replication of usurpation, because it charged the plaintiffs in error as a corporation.
The second point is, that the directors failed to sell the stock of subscribers who had not paid their calls. This question arises under a provision in the 8th section of the charter, which is in these words: “Should any stockholder refuse or'fail to pay any instalment on his stock, when called for, the company shall sell said stock, on giving thirty days’ notice, in some gazette, on account of, and at the risk of the stockholder.” The replication as to the breach of this provision, charges.that after the bank went into operation, to wit, on the 2d day of May, 1836, divers stockholders failed to pay the first instalment on their stock, then due, and directed to be paid by the directors at the banking-house, and that the bank did not, on such failure, on being requested, sell, or expose to sale, the stock of such delinquent stockholders.” The demurrer to this replication was also overruled. The failure to comply with this provision was not a cause of forfeiture; the authority to sell the stock was a mere cumulative remedy, given to the corporation to enable it to coerce the payment of stock in a more speedy. manner than by action at law. The usual remedy is by suit *616 on the agreement to pay the stock; and as well might it be said that a bank forfeited its charter .by a failure to sue its stockholders for non-payment. There are other provisions in the charter which must be kept in view in connection with this, from which it will be seen that the authority to sell was a mere power conferred on the directory, to be exercised at their discretion. The first section directed that one fifth of the stock should be paid for at the time of subscribing, and the balance at such times as the directors might think proper to call for it, provided that all the stock subscribed for at the first opening of the books, should be paid for within fifteen months, and all subsequently taken, should be paid for within fifteen months from the time of subscribing. Within this prescribed limit, the collection of stock was left entirely with the directors; and it will not do to say they were bound to sell, at any rate, before fifteen months had elapsed. This would be to make the two provisions repugnant. By the act of 1837, the provision which required the stock to be paid for within fifteen months, was repealed, and the directors were authorized to call in the stock when they might think proper. Whether this act was accepted or not, it shows the view of the legislature on the subject. The principle now involved was decided in the case of The Canal Company v. Sauson, 1 Binney, 70. In chartering the company the legislature of Pennsylvania inserted a clause authorizing the directors to make the calls on the subscribers, with the further provision that the stock should be forfeited for non-payment of the instalments. The language of that charter was even more imperative than the language, of this. After declaring that if any stockholder should neglect to pay the instalment, it provided for a forfeiture and sale of the stock, in the following words, to wit: “The same shall be forfeited to the company, and may and shall be sold by them to any person or persons,” &c. This charter not only conferred the power to sell, but superadded a command that the power should be exercised, and yet it was held that the company had a discretionary power; that as the provision was intended to coerce payment it might be waived. In the case of The Goshen and Min *617 sinck Road Company v. Hurtin, 9 Johns. 217, it was held .that an action might be maintained on a written promise to pay, made by a stockholder, notwithstanding the provision in the charter for the forfeiture and sale. The principle decided by this case is, that the remedy given by the charter is merely cumulative. See also 2 Bibb, 577; 3 Hawkes, 520. In the construction of charters a distinction must be observed between those provisions which are intended to apply merely to the internal government of the corporation, and those which impose positive conditions, restrictions, or duties, in which the public interest is involved. For a violation of the latter, a forfeiture occurs, but not so with regard to the former. After the legislature had left the time of making calls, and the amount, with the directors, it is impossible to perceive any reason for construing the charter as making a positive command to sell. The power to sell was for the benefit of the corporation only. Believing, then, that this, like the preceding replication, was defective in substance, it was the proper subject for a demurrer. This view of the subject renders it unnecessary to notice the technical objections to the pleading. The matter being insufficient, it is immaterial how it was pleaded.
The next and most important question is, did the bank forfeit its charter by refusing to redeem its issues with specie? This question is raised by the eighth replication, which avers that by the act of 1840 all the banks in this state were required, after the 1st of January, 1841, to resume specie payments upon all their notes, bills and other liabilities of whatever denomination then due, and that after the act went into operation, “ to wit, on the first day of November, 1841, and on divers other days before and since, the said Commercial Bank of Natchez did refuse, on demand being made at its counter, in its banking house in said city of Natchez, during the regular hours for doing business, to redeem in specie or other lawful money of the United States, the notes, bills, bonds and other liabilities issued by said bank, and then due.” The demurrer to this replication was overruled, and thereupon the defendant rejoined. To the rejoinder the demurrer of the district attorney was sustained. *618 If the matter pleaded in the replication should be a good cause of forfeiture, it will then be necessary to determine whether it has been well pleaded.
The charter contains no provision which in so many words requires the bank at all times to pay specie, and yet it was obviously considered and looked to as a paramount duty. A part of the seventh section declares that “should said bank refuse at any time to pay its notes in specie, it shall be the duty of the cashier or teller, under the penalty of five hundred dollars, for each and every such refusal, to indorse on such note or notes, when presented, the date of their presentation, and the refusal of the bank to pay, and. sign his name officially thereto; and all such notes shall bear interest at the rate of twelve and a half per centum, per annum, from the day of their presentation. Besides this provision the capital stock was to be paid in gold or silver or the notes of specie-paying banks, and the bank was prohibited from issuing notes to a greater amount than threé. times the amount of the capital stock paid in. These provisions prove that the capital was to be in specie, and that it was to be a fund for the redemption of the issues. But if the charter had been entirely silent, it was still a paramount duty of the bank to redeem its notes in specie, under an implied condition which necessarily resulted from the objects of its creation, and, from the power to issue notes for a circulating medium for the profit of the corporation. This is a condition which is essentially imposed on every bank created with power to issue notes, and assented to by the acceptance of the charter. The proposition is self-evident that it was bound to redeem its issues with specie, and that a failure to pay at any period of its existence was a breach of that condition, a breach of duty, a violation of an implied pledge; and if there be anything which will constitute an excuse, and save a forfeiture, it must be found in the charter, or result from it by a fair intendment. The charter contains no direct authority for suspension, but it is said to be authorized, or at least excused by that provision which gives to the note-holder a right to demand an interest of twelve and a half per cent, per annum on notes that the bank refuses to pay. This is believed to be a *619 misapprehension of the effect of this provision. It furnishes no implied authority for the suspension of specie payments; it is but an indemnity for the note-holder; it looked to nothing else but the rights of individuals, or if it did the design was to compel the bank to do its duty. Viewed in this light, it would be strange reasoning to say that the means eimployed to coerce the discharge of a duty, constitute a good excuse for the breach; that the penalty imposed, legalizes the of-fence. The question of forfeiture is between the state and the bank ; the question of interest is between the individual and the bank. If the mere claim of interest, or the right to demand it, will excuse the suspension, it may be continued for an indefinite time, and although a bank might in this way defeat the great object of its creation, yet a forfeiture could not be enforced. The exercise of sovereign power for the benefit of all, is a prinr ciple inherent in government, and it is not to be deprived of that power by remote implication ; the intention must be manifest. It cannot be supposed that the legislature intended that the state should have no remedy for the abuse of power which it granted to the corporation, and that the bad faith to the state should be remunerated by making compensation to individuals. If so, an invitation, an inducement, was held out to the bank to refuse to pay specie, and thus to spread the evils of an irredeemable currency. The authorities do not bear counsel out in this position. In the case of the Commonwealth v. Breed, 4 Pick. 460, the question was whether the charter of a bridge had been forfeited. The act required that the draw should be attended by proper persons at the expense of the proprietor; and a penalty was provided for any delay that might be caused by a failure to raise it. No person was kept at the draw, but by a general understanding with the coasters that it would be more convenient to them, the key or crank was left there, so that the crew of the vessel might raise it themselves. The court remarked that any delay would subject the owner to a penalty, but would not be cause of forfeiture. It is manifest that the penalty was considered as an ample compensation to the owners of vessels who alone were interested. The public generally was not interested, *620 but the whole community have an interest in the soundness of currency. But besides, it appeared by the special finding of the jury that the attendance of a person at the draw was dispensed with by a general agreement with the navigators. They had waived the performance of a duty intended for their benefit. The great object of the bridge was the accommodation of the public crossing the water, and there was no impediment in this respect by the failure to attend the draw. The duty required of the proprietor in keeping some one at the draw to raise it, was substantially performed by his procuration: He agreed with the navigators to raise the draw and they did so. The object was to have the draw raised, so that delay might not occur, and the duty was performed. This was a substantial compliance.
In the case of The People v. The Washington & Warren Bank, 6 Cow. 216, the court remarked that a refusal to pay specie, unless arising'from continued insolvency, was no ground of forfeiture, and that the remedy of the creditors would seem to be by action. That decision was made on a charter which in effect authorized a suspension, by providing that whilst it refused to pay, the bank should not do business, and the alleged ground of forfeiture was, that during its suspension, the bank had continued to do business. It was not the remedy of the creditor that was considered as justifying the refusal to pay-specie.
The most direct precedent on this point is the case of The People v. Thompson, reported in 21 and 23 Wend. A charter had been granted to a bridge company which required that a bond should be given by the company for the due performance of the conditions imposed by the charter. The bond was given, and on a proceeding by quo warranto it was contended that the remedy on the bond was the only one; that by requiring the bond to be given, the other remedy had been abandoned ; but the supreme court of New York held that the right to proceed by quo warranto was not thereby taken away or waived. On a- review of this case by the court for the correction of errors, Senator Verplanck, in an opinion remarkable for its clearness *621 and force of reasoning, gave his unqualified assent to this principle which had been decided by the supreme court, although he differed on other points. The bond was regarded as furnishing a cumulative remedy. It is a general principle that a remedy given by statute does not take away a common law remedy unless negative terms be used, or where the matter is so repugnant that a negative may be implied. If a penal bond does not supersede the remedy by quo warranto, a statutory penalty will not, and much less reason is there for saying that the remedy, or rather the interest given to note-holders, will have that effect. It is in truth but a law that regulates bank interest.
But it is insisted that a refusal to pay specie does not necessarily work a forfeiture, even if it be not saved by the other remedy, and there are some authorities which seem to incline that way, whilst others hold to a contrary doctrine. Theprecise point, stript of all extraneous matter, or qualifying circumstances, has but rarely been the subject of direct adjudication, and indirect decisions, or incidental remarks are not reliable authority. A single question may serve to throw some light upon the right to suspend specie payments, and the consequences. Can the state create a bank and empower it to issue notes without requiring it to redeem them in specie 1 This question admits of none other than a negative answer. Can a bank, then, do what the legislature could not empower it to do, and still retain its franchises 1 On a careful examination of the authorities referred to, we find them correctly holding that conditions in a charter are tobe construed as conditions in individual contracts, and to be construed most favorably to the grantee; that a substantial compliance is all that is required ; that courts should incline against a forfeiture. The deduction of counsel is, that a mere temporary suspension will not be cause of forfeiture. From the most of the authorities it is impossible to extract any precise rule, susceptible of a certain practical application. There is but little diversity of opinion when the suspension is what is called permanent, or continued. Then all agree, with perhaps a solitary exception in Alabama, that it is cause of forfeiture. This was admitted in New York under charters that *622 sanctioned a suspension by requiring that during its continuance the banks should cease to do business. But the decisions do not define what they mean by a permanent or continued suspension or insolvency, and what by a temporary suspension. These terms have no definite legal meaning, and in common meaning they do not convey to the mind the idea of any precise rule by which to ascertain when a forfeiture has occurred. Nothing is permanent which may vary or change, and nothing can be said to be continued which does not remain in the same state. A bank might refuse to pay eleven months out of every twelve, and if on the twelfth it resumed, its refusal could not be said to be either permanent or continued. Before we proceed to lay down any general rule on this subject, it is necessary to determine what influence the statute law is to have on it.
In 1840, whilst the banks were in a state' of suspension, the legislature passed an act requiring them to resume. By the 8th section it was provided that they should resume on their notes of five dollars by the first of April thereafter; on their notes of ten dollars, by the first of July; on their notes of twenty dollars by the first of October, and that by the first of January, 1841, they should resume specie payments on all their notes, bills, bonds, and other liabilities then due. The 8th replication is founded on this act, and if it be a valid law it must settle the question, at least as to a general suspension after the 1st of January, 1841. But it is said to be unconstitutional, because it imposes duties and obligations repugnant to the provisions of the charter. W e recognize the doctrine to its full extent, that an act of incorporation is a contract within the meaning of the constitution of the United States, and that any legislative act which impairs it by enlarging the power of the state over the body corporate, or by abridging the franchises, or which alters it in any material point, is void ; but no such effect is perceived as resulting from this act. We have said that it was necessarily a condition in the charter, a paramount duty, that the bank should redeem its notes with specie; we have also said that it acquired no right to refuse to redeem in consequence of the right given to the note-holder to demand interest. If these *623 positions be correct, it follows that it was always, the duty of the bank to redeem. The state made no contract by which the bank could be excused from the performance of this duty. This act then superadds no new duty or obligation. It does not enlarge the power of the state; it does not diminish any power or privilege of the bank; it does not add to or vary the charter in the slightest degree to the prejudice of the bank. It only requires, that to be done by express terms, which the bank was before impliedly bound to do. It was a command that the bank should by a certain day perform the condition of its contract. In effect it amounted to a waiver of the right to enforce a forfeiture for the previous suspension, and justified a continuation of the refusal to pay up to the 1st of January 1841, and if the banks then failed to comply with the requisition of the act, it was new cause of forfeiture.
But the question again arises under this law, did the hank forfeit its charter by every single isolated refusal to pay specie ; or did it require a continued or permanent suspension to have that effect! No doubt a single instance of wilful and obstinate refusal, if properly alleged in pleading, would be sufficient. Still, it is difficult to say that exigencies might not arise which would excuse a mere temporary suspension. In this state of uncertainty it is not an easy matter to draw a line between what will, and what will not excuse. The adjudged cases do not do it. The law requires but a substantial compliance with conditions, and it is not rigid in enforcing forfeitures; yet if the utility of the corporation be lessened, or if an injury result to the public by an act which it is not authorized to do, it is a forfeiture. The grant to the corporation is made on an implied pledge that the conditions shall be performed, and when the public is affected by the breach of a condition, it is inexcusable. The condition is then not substantially performed. Not that the state is bound to prove an actual injury ; if the act be such as in the nature of things, is calculated to produce the injury, then it is sufficient cause of forfeiture, and of this description is that charged in the replication.
But it was also said that a refusal to pay specie was no for *624 feiture, because the legislature must have contemplated such a state of things when it authorized the bank to issue notes to three times the amount of the capital stock paid in. This provision is generally found in bank charters, and it is based'upon the laws of a circulating medium, which, in a healthy state of affairs, are supposed to justify it. But a circulation to three times the amount of the capital stock is not justified under all circumstances. Expansions and contractions must be regulated by the discretion of the directors. The power is given to them on the supposition that it will be exercised with all proper precaution in view of the fluctuations to which circulating bank notes are liable. It is intended for the benefit of the stockholders, and the corporation must take the risk of a misjudged expansion.
We are thus brought to the inquiry, is a violation of the charter affirmatively shown with sufficient certainty by the eighth replication I for the state must lay a good charge; it is not for the corporation to bring forward excuses. It is not bound to answer an allegation which does not charge it with a breach of conditions that amount to a forfeiture. If a single instance of refusal to pay, or even a temporary suspension will not amount to a forfeiture, then something more must be charged in pleading, for the pleadings must follow the law. It was not necessary, then, to specify a particular note, or a particular person that had been refused, as single instances did not necessarily complete the offence. Was it necessary that the replication should have been more certain as to the duration of the suspension1? Time is not usually material in pleading; still, where the offence or injury is incomplete if not continued for a given period of time, it must be pleaded as having been continued so long. But the law does not measure the precise time of suspension which is requisite to constitute a forfeiture. If the law be vague, the pleadings may be so. The bank is charged with having refused to pay its notes “ on the first day of November, 1841, and on divers other days and times before and since.” In torts, if a recovery is sought for a continuation of the offence, it is laid with a continuando ; that is, from a cer *625 tain day to a certain other day. If it be sought on the ground of a repetition of distinct acts of the same nature, then they may be laid as having been committed on a certain day, and on divers other days and times between that day and a certain other day, or between that day and the time of suing out the writ. Gould’s Pl. 104, 105; 1 Saund. 24, note 1; 16 Mass. Rep. 470. This last mode of pleading is substantially followed by the replication, with but a slight variation in form. The refusal to pay was on a certain day, “ and on divers other days and times before and since.” It is equivalent to a charge that it refused on that day, and on divers other days and times between the time laid and the suing out of the writ, a period of more than two years. Proof would have been admissible under the pleading of repeated refusals from the 1st of November 1841, up to the time the writ was issued. The replication alleges with certainty to a common intent, an act which was cause of forfeiture. It follows in every material point the form which is found in the case of the People v. The Bank of Niagara, 6 Cow. 196, with which Chief Justice Savage said he was satisfied. The sufficiency of the replication was questioned in the case of the People v. The Manhattan Company, reported in 9 Wend., which is cited and relied on as an authority against the sufficiency of this replication, and it would be so if the two cases were entirely parallel. By the charter the company was bound to furnish and continue a supply of pure and wholesome water, sufficient for the use of all such citizens dwelling in said city as should agree to take it on the terms demanded by the company. The breach was that although a great number of citizens had at all times been willing and desirous to agree for and take from the Company pure and wholesome water sufficient for their use, and on such terms as should be required, yet the Company had not at any time since the passing of the act, furnished, or continued a supply of pure and wholesome water, sufficient for the use of all such citizens dwelling in said city as were willing and desirous to agree for and take the same. This replication was held bad, and it was manifestly so. The Company was only bound to furnish water to such as might *626 require it on the terms prescribed or agreed on, and no request or offer to pay was averred, or even notice to the Company of the desire of any one to take water. The company was not in default until it had been applied to and refused. There was nothing tendered in pleading on which issue could be taken. A rejoinder of general denial would "have presented but an emotion of the mind, to wit, the willingness of the citizens to take water on the-Company’s terms. There are obvious distinctions between that case and this. The Company being only bound to furnish water to such as might desire it, a request was necessary, and not only a request, but an agreement to give the required price, a pre-contract. The only issue presented was an emotion of the mind, which is not triable. In this case a request or demand of the bank is charged. No contract or agreement was necessary, and the issue presented is a fact capable of ascertainment. We conclude, then, that the demurrer to the 8th replication was properly overruled.
In the next place was the defendant’s rejoinder, which was put in after the decision on the demurrer, a sufficient answer to the replication. It avers that the bank, after the first day of January 1841, paid all its notes and liabilities except certain checks which had been drawn on the Merchants Bank of New Orleans, for the .payment of which, provision had been made with said Merchants Bank, but it failed to pay and the checks were returned, and on being returned, the bank was unable to pay them; but that on the 1st day of December 1843, before the. commencement of this suit, it resumed specie payments on the checks, and on all other liabilities, whenever payment was demanded at its counter, and is yet ready and willing to pay. We.know of no good reason why the bank was not as much bound to pay its checks as its notes, or other liabilities. Beyond question it was, if the checks were put out for the purposes of circulation, and any provision which was made with the Merchants Bank for the payment of the checks,' constitutes no excuse whatever. Were it otherwise, a bank might throw out all its circulation in checks or bills, and contend that it was only bound to pay specie on its notes. Nor does the resumption *627 of specie payments before the filing of the information, furnish any excuse. It was under the peculiar charter before noticed, that such a rejoinder was held sufficient in New York. The rejoinder was defective in form, being double, as well as in substance.
The question of waiver was discussed as applicable to the replication which charged the bank with’a failure to establish branches. In the view taken of the case this question becomes immaterial, as does also the question in reference to the injunction. If the bank has forfeited its charter on either of-the grounds taken, the effect is the same as though all were sufficient. The judgment must be affirmed.