This case came into the Superior Court of the State of Delaware in and for New Castle County on appeals from two judgments of a justice of the peace, and from that into this court on a case stated, with questions of law reserved in them for hearing and decision before all the Judges in the Court of Errors and Appeals, and was heard at this term before Bates, Chancellor, Gilpin, Chief Justice, and Wootten, Houston and Wales, Associate Judges. The case stated was as follows:
And now, to wit, this 29th day of May, A. D. 1873, it is hereby agreed by and between the parties to the above entitled cause, that the following case be stated as if found by a special verdict for the opinion of the Court:
1. The appellant, the Philadelphia, Wilmington and Baltimore Railroad Company, was formed in the year 1838 by the union and consolidation of the Baltimore and Port Deposit Railroad Company of Maryland, the Philadelphia, Wilmington and Baltimore Railroad Company of Pennsylvania, and the Wilmington and Susquehanna Railroad Company of Delaware and Maryland; the last named company having been formed in the year 1836 by the union and consolidation of the Wilmington and Susquehanna Railroad Company of the State of Delaware, and the Delaware and Maryland Railroad Company of the State of Maryland.
The original Wilmington and Susquehanna Railroad Company of Delaware was incorporated under and in pursuance of an Act of the General Assembly of the State of *Page 508 
Delaware, entitled, "An Act to Incorporate the Wilmington and Susquehanna Railroad Company," passed on the eighteenth day of January 1832, and possessed all the franchises, rights and privileges by the said act, and the several supplements thereto, conferred; among others, that of constructing, maintaining and operating a railroad extending from the Pennsylvania State line to the city of Wilmington, and thence to the line of the State of Delaware towards the Susquehanna river in the direction of the city of Baltimore in the State of Maryland.
The Delaware and Maryland Railroad Company was incorporated under and in pursuance of the provisions of an act of the General Assembly of the State of Maryland, passed at their December session, 1831, entitled, "An Act to Incorporate the Delaware and Maryland Railroad Company," and possessed all the franchises, rights and privileges by the said act and the several supplements thereto, conferred; among others, that of constructing, maintaining and operating a railroad extending from a point on the Delaware and Maryland line through the town of Elkton to some point on the Susquehanna river.
The said Wilmington and Susquehanna, and Delaware and Maryland Railroad Companies were united and consolidated into a corporation known as the Wilmington and Susquehanna Railroad Company by authority of an act of the General Assembly of the state of Delaware, entitled, "A further supplement to an act entitled `An act to Incorporate the Wilmington and Susquehanna Railroad Company'," passed the 24th day of July A. D., 1835, and of an act of the General Assembly of the State of Maryland, passed at their December session, A. D., 1835, entitled, "A further supplement to the act entitled, `An Act to incorporate the Delaware and Maryland Railroad Company'," and in pursuance of certain "Articles of Union" adopted, certified and recorded by law, a copy of which certificate is hereto annexed, marked exhibit A.
The Baltimore and Port Deposit Railroad Company was incorporated under and in pursuance of the *Page 509 
provisions of an act of the General Assembly of the State of Maryland, passed at their December session, A. D. 1831, entitled "An Act to incorporate the Baltimore and Port Deposit Railroad Company," and possessed all the franchises, rights and privileges by the said act and the several supplements thereto conferred; among others that of constructing, maintaining and operating a railroad from the city of Baltimore, in the State of Maryland to Port Deposit, in the same State.
The Philadelphia, Wilmington and Baltimore Railroad Company, of Pennsylvania, was originally incorporated as "The Philadelphia and Delaware County Railroad Company," under and in pursuance of an act of the General Assembly of the Commonwealth of Pennsylvania, approved the second day of April, A. D. 1831, entitled, "An Act Authorizing the Governor to incorporate the Philadelphia and Delaware County and Southwark Railroad Company," and possessed all the franchises, rights and privileges by the said act and the several supplements thereto conferred; among others, that of constructing, maintaining and operating a railroad from the city of Philadelphia to the boundary line of the State of Delaware. The name of the said Company was changed to that of the Philadelphia, Wilmington and 'Baltimore Railroad Company by a supplement to the act of incorporation approved the 14th day of March 1836.
The union of the consolidated Wilmington and Susquehanna Railroad Company, the Baltimore and Port Deposit Railroad Company, and the Philadelphia, Wilmington and Baltimore Railroad Company of Pennsylvania, was effected by the execution of certain "Articles of Union," (a copy of which is hereto annexed, marked exhibit B), by the said three companies on the fifth day of February 1838, under the authority and in pursuance of the acts of Assembly therein recited.
Before the last mentioned union, by which the present Philadelphia, Wilmington and Baltimore Railroad Company was formed, the Baltimore and Port Deposit Railroad *Page 510 
Company had constructed a railroad extending from Baltimore to the west bank of the Susquehanna river, the consolidated Wilmington and Susquehanua Railroad Company had constructed a railroad extending from the east bank of the Susquehanna river to the city of Wilmington, and the original "Philadelphia, Wilmington and Baltimore Company" of Pennsylvania had, under and in pursuance of a transfer by the Wilmington and Susquehanna Railroad Company, made in accordance with the second section of an act of the General Assembly of the state of Delaware, passed on the 13th day of January 1837, entitled "A further supplement to an act entitled `An Act to Incorporate the Wilmington and Susquehanna Railroad Company'," of its rights and privileges in the premises, constructed that portion of the railroad originally intended to have been constructed by the Wilmington and Susquehanna Railroad Company, which extended from the city of Wilmington to the divisional line between the States of Delaware and Pennsylvania, and had, under the power conferred by its own charter, constructed a railroad from the said divisional line to a point within the now corporate limits of the city of Philadelphia.
The railroads constructed by the said three companies formed a continuous line, extending from a point at or near the city of Philadelphia, in the State of Pennsylvania, through the State of Delaware to Baltimore, in the State of Maryland, except the interval between the eastern terminus of the railroad of the Baltimore and Port Deposit Railroad Company on the west bank of the Susquehanna river, and the western terminus of the railroad of the Wilmington and Susquehanna Company on the cast bank of the said river, between which termini communication was maintained by means of a ferry-boat belonging to the two companies owning the railroads terminating at the river.
2. Since the consolidation of the said three companies the Philadelphia. Wilmington and Baltimore Railroad. Company has been and was on the 29th day of April 1873, *Page 511 
engaged in the business of carrying and transporting passengers and freight by steam power on the said line of railroad, which, by the completion of a railroad bridge across the Susquehanna river in the year 1866, was rendered a continuous line, expending without break or interval, from the city of Philadelphia, in the State of Pennsylvania, through the State of Delaware to the city of Baltimore, in the State of Maryland, with a short branch line of road, being a part of the said Baltimore, and Port Deposit Railroad, from Perryville, on the main line of the consolidated roads to Port Deposit, both in the State of Maryland. The said line of railroad forms part of a great line of travel and transportation between the Northern and Southern States of the Union. The capital invested in its maintenance and operation by the present consolidated Company has been largely increased since the formation of the said company, being now represented by 230,055 shares of capital stock, of the par value of fifty dollars per share.
3. The said Company is, and was on the 29th clay of April 1873, also engaged in the carriage and transportation of passengers and freight by steam power on a line of railroad, operated but not owned by it, of which it is the lessee, connecting with its aforesaid main line of road at Delaware Junction, in the State of Delaware, and thence extending southwardly to the southern boundary of the State of Delaware and there connecting with the Eastern Shore Railroad, extending to Crisfield, in the State of Maryland.
4. On the 11th day of April, A. D. 1873, the General Assembly of the State of Delaware, passed an act in the words following, viz.:
 AN ACT RELATING TO THE TAXES OF THE PHILADELPHIA, WILMINGTON AND BALTIMORE RAILROAD COMPANY. Be it enacted by the Senate and House of Representatives, of the State of Delaware, in General Assembly met:
SEC. 1. That the Treasurer of the State be and he is *Page 512 
hereby authorized and directed to accept and receive from the Philadelphia, Wilmington and Baltimore Railroad Company, in the year of our Lord one thousand eight hundred and seventy-three, and in each and every year thereafter until otherwise directed by the Legislature, the annual sum of twenty-seven thousand dollars to be paid in equal quarterly payments on the first day of July, October, January and April, of each year, the first payment to be made on the first day of July next in lieu of all taxes which may hereafter become due from said Company in each year as aforesaid under any and all laws of this State, except such taxes as may become due under the provisions of an act entitled "An act to raise revenue for this State," passed August 11th, 1864.
SEC. 2. That upon the payment by the said Philadelphia, Wilmington and Baltimore Railroad Company to the Treasurer of the State of the said sum of twenty-seven thousand dollars in equal quarterly payments as aforesaid in any year, it shall be the duty of the said State Treasurer and he is hereby authorized to execute and deliver to said company, a proper acquittance and discharge from the payment of all taxes due or to become due in the year for which such payment shall have been made, except the tax due or to become due under the provisions of the aforesaid act, entitled "An Act to raise revenue for this State," passed August 11th, 1864.
SEC. 3. That nothing in this act shall be construed to repeal, modify or in any manner affect any existing law imposing taxes upon the said company otherwise than to suspend a collection of said taxes in any year which the said company shall pay to the State Treasurer the amount specified in this act, nor shall the provisions of this act or anything herein contained be construed into a contract exempting the said company from the payment of such taxes as the Legislature of the State may hereafter impose upon said company.
SEC. 4. That if the said Philadelphia, Wilmington and Baltimore Railroad Company, or any other railroad company in this state shall, either as the operator of its *Page 513 
own railroad or railroads, or as lessee of other railroads within the State, charge and receive a greater rate per mile for the carriage of passengers (except so far as the same may be increased to the amount of the tax annually paid under the provisions of Chapter 458, Volume 12, of the Laws of Delaware) or for the carriage or transportation of goods, wares or merchandise or other property whatsoever, from place to place within the State, or from a place within the State to a place without the State than is charged by such company for the carriage of passengers and the transportation of property or freight for like distances, or per mile from places without the State to places within the State, or from places without the State through the State to other places without the State, the person or persons paying such charges, either as fare or freight, shall be entitled to recover from such company so charging and receiving the same, a sum of ten-fold the amount of the money so paid, to be recovered in an action of debt or assumpsit as like amounts are now recovered by law.
SEC. 5. That if the said Philadelphia, Wilmington and Baltimore Railroad Company may desire to pay to this State a gross sum of thirteen thousand dollars in lieu of the said tax provided for in said Chapter 458, Volume 12, Laws of Delaware, in semi-annual installments on the first day of October and the first day of April, in each and every year, it shall be the duty of the State Treasurer to receive the said amount from said company in lieu of said tax until otherwise directed by the Legislature of this State, but nothing in this section shall be construed to repeal, modify or in any manner affect the provisions of said Chapter 458, Volume 12, of the Laws of Delaware, otherwise than to suspend the collection of said tax for any year in which the said company shall pay the gross amount aforesaid in the manner aforesaid in lieu of said tax: and: nothing herein shall be construed as a contract exempting the said company from such taxation as may hereafter be imposed by law.
 Passed at Dover. April 11th, 1873. *Page 514 
5. On the 29th day of April, A. D. 1873, the appellant carried the respondent as a passenger from Philadelphia, a place without the State of Delaware, to the city of Wilmington, in the State of Delaware, a distance of twenty-six and forty-one hundredths miles, and for the carriage of the respondent as a passenger, as aforesaid, the appellant charged and received of and from the respondent the sum of fifty cents, being at the rate of $0.0189 per mile.
On the same day the appellant carried the respondent as a passenger from the city of Wilmington, a place within the State of Delaware, to Port Deposit, a place without the State of Delaware, a distance of thirty-seven miles, and for the carriage of the respondent, as last aforesaid, the appellant charged and received of and from the respondent the sum of $51.85, being at the rate of $0.05 per mile.
The respondent claims that the latter charge was an overcharge in that for the carriage of the respondent as a passenger he paid at the rate of $0.0311 per mile more in the latter than the former case, that is to say $1.15; and he seeks to recover under the fourth section of the act above recited, ten fold the amount of such overcharge, or $11.50. The appellant hath refused, and still refuses, to pay the said sum, alleging —
1st, That the enactment of the fourth section of the act last before recited, was not a valid exercise of Legislative power, and that the said section is null and void, and, therefore, no right of action can accrue to the plaintiff under or by virtue of the same.
2d, That even admitting the enactment of the said last mentioned section to be a valid exercise of Legislative power, upon the facts as stated, no overcharge was made within the true intent and meaning of the law.
If the Court shall be of opinion that upon the facts as stated, the enactment of the fourth section of the act last before recited was a valid and constitutional exercise of Legislative power, and that within the true intent and meaning of the law an overcharge was made upon the *Page 515 
facts as stated, then judgment shall be entered for the plaintiff below, respondent, for $11.50, otherwise judgment shall be entered for the defendant below, appellant, either party to have the right to remove the record to the Court of Errors and Appeals of this State, and to sue out a writ of error from the Supreme Court of the United States to the said Court of Errors and Appeals. It is further agreed that either party may refer in the argument of the case to any act of the Legislature of Delaware. Maryland or Pennsylvania, relating to any of the four railroad companies now represented by the Philadelphia, Wilmington and Baltimore Railroad Company, or to the said last mentioned company itself, and that any and all acts of assembly thus referred to shall be considered as and form part of this case stated, also the original articles of union (copies of which are hereto annexed).
The other case stated only varied from the foregoing, as follows:
5. On the said 29th day of April, A. D. 1873, the appellant carried for the respondent as freight, nine thousand feet of dry lumber from Port Deposit, a place without the State of Delaware, to the city of Wilmington, in the State of Delaware, being a distance of thirty-seven miles, and for the carriage of said lumber as aforesaid the appellant charged and received of and from the respondent the sum of $14.73, being at the rate of $0.39 30/37 per mile. On the same day the appellant carried as freight for the respondent, nine thousand feet of dry lumber, from Newport to Wilmington, both being places within the State of Delaware a distance of four miles, and for the carriage of said freight as last aforesaid, the appellant charged and received of and from the respondent the sum of $7.35, being at the rate of $1.823/4 per mile.
The respondent claims that the latter charge was an overcharge in that for the carriage of the same quantity of freight he paid at the rate of $1.42 per mile more in the latter than in the former case, that is to say, $5.68; and he seeks to recover under the fourth section of the act *Page 516 
above recited, ten-fold the amount of such overcharge or $56.80. The appellant hath refused and still refuses to pay the said sum, alleging —
1st, That the enactment of the fourth section of the act last before recited, was not a valid exercise of Legislative power, and that the said section is null and void, and, therefore, no right of action can accrue to the plaintiff under or by virtue of the same.
2d, That even admitting the enactment of the said last mentioned section to be a valid exercise of Legislative power, upon the facts as stated, no overcharge was made within the true intent and meaning of the law.
If the Court shall be of opinion that upon the facts as stated, the enactment of the fourth section of the act last before recited was a valid and constitutional exercise of Legislative power, and that within the true intent and meaning of the law an overcharge was made upon the facts as stated, then judgment shall be entered for the plaintiff below, respondent, for $56.80, otherwise judgment shall be entered for the defendant below, appellant, either party to have the right to remove the record to the Court of Errors and Appeals of this State and to sue out a writ of error from the Supreme Court of the United States to the said Court of Errors and Appeals. It is further agreed that either party may refer in the argument of the case to any act of the Legislature of Delaware, Maryland or Pennsylvania, relating to any of the four railroad companies now represented by the Philadelphia, Wilmington and Baltimore Railroad Company, or to the said last mention company itself, and that any and all acts of assembly thus referred to shall be considered as and form part of this case stated, also the original articles of union (copies of which are hereto annexed).
The exhibits referred to in the cases stated, though annexed to them, are omitted as unnecessary in the report of the case in this court.
Bates, for the plaintiff below, respondent, upon the *Page 517 
first question presented in the case stated, contended that the fourth section of the statute, in question, was a constitutional exercise of legislative power. The only provision of the Constitution of the United States which it was said to contravene, was that which. proclaims that no State shall pass any law impairing the obligation of contracts. He was not prepared to controvert the proposition that the charter of the company constitutes a contract between it and the State, and that a material alteration of it without the consent of the company would impair the obligation of the contract involved in it; but it had never yet been decided that such a statute, in particular as this, would impair the obligation of the contract constituted by the charter between the State and the company. The essential point ruled first in the Dartmouth College Case, and since recognized and affirmed in several other cases, was that the charter constitutes a contract between the State and the company; but it must be borne in mind that it does not put a corporation on any other or better footing than an individual, for a corporation has not all the rights, privileges, or immunities of a natural person, or an individual, but only such as its charter, either in express terms or by necessary implication confers upon it; and it cannot claim any other privilege or immunity certainly than such a contract would confer on an individual. DartmouthCollege vs. Woodward, 4 Wheat. 519. Thorp vs. R. B. R. R.Co. 27 Verm. 145. Binghamton Bridge Case, 3 Wall. 74.People vs. C. A. R. R. Co., 5 Amer. Law Times 209, 217.Cool. on Const. Lint., 87. The legislature must be held to possess sovereign power in its sphere of making laws to the same extent as the Parliament of Great Britain, except so far as it is limited and restricted by the Federal or State Constitutions. Cool. on Const,him. 57, 88. People v. Draper, 15 N. Y. 543. 27Venn. 142. 6 Crunch 136. An act of the Legislature is presumed to be constitutional and valid, and if its unconstitutionality is alleged, it is incumbent on those who allege it to establish it; and to sustain the objection taken to this act, the court must be satisfied that it conflicts *Page 518 
with the express provisions of the charter, or that it limits and abridges some power, privilege or immunity conferred by it, in such a manner, as to preclude all future legislative interference with it without the consent of the company. It must appear that the section of the statute in question, limits or curtails some express or implied power conferred by the charter on the company; and there was none such in this case, unless the general authority to charge tolls was to be so construed. But the act of the legislature of the 4th of February 1833, consolidating the several separate companies into one, as well as the original act of incorporation of the Wilmington and Susquehanna Railroad Company in the seventeenth section of it, and the original act incorporating the Philadelphia and Delaware County Railroad Company, in the fifteenth section of it, and that too, of the Maryland and Delaware Railroad Company, in the nineteenth section of it, all alike prescribe the rates of toll upon their respective roads, and were in principle and in view of the law the same as the provision objected to and contained in the fourth section of the late act now in question.
But the Legislature cannot by an act of incorporation, or any other act alienate or part with any of its powers, or the sovereignty of the State in the exercise of which the State is interested. HartfordBridge Case, 10 How. 534; and the right and authority of the legislature to regulate the charges of common carriers is such a power, for the law-making power has always exercised control over them to prevent exorbitant charges, or unjust discriminations in respect to them, in which the public is so largely and vitally interested. And is the question of the lawful power and authority so to regulate and control them, and when, or to what extent it shall be exercised in any case, a registative, or a judicial question? Railroad companies arequasi public corporations. Cool. on Const. Lim. 283. And the company in question is expressly declared to be such in its charter. A railroad is also a public highway, although the stock of the company is private property; *Page 519 
for the charter is not granted merely to make money for the corporators, but the main design of it is the public good and to promote the general welfare of the community, and all its rights of eminent domain and all its franchises as a corporation are delegated and conferred upon it by the legislature as a trustee for that great purpose. But even viewed as private property, every company holds it, as every individual owns and holds his property, that is to say, subject to the power of the legislature to regulate the use of it. 5Amer. Law Times 204. 6 Ibd. 56. No railroad had ever been constructed without obtaining more or less of the lands which they occupy under the exclusive power of the legislature to condemn the same for public use.
There are doubtless certain powers conferred by the charter which were matters of contract between the State and the company, but general rights or powers which are not conferred by it as property, are subject to regulation by the legislature. Bank of the Republic vs. HamiltonCounty, 21 Ill. 59. The power of the company to prescribe its rates of toll, was not a right conferred on the company as property.The People vs. The Chicago and Alton R. R. Co., 5 Amer. LawTimes 216. And railroad companies in their relation to the State are public institutions. Pierce on Amer. Railr. Law, 20. Again, no limitations upon the powers of the legislature are to be implied from the charter of the company, for in grants by the public nothing passes by implication. No privilege is to be implied from the charter, for all monopolies are to be construed strictly, and all corporations are such in their character. The power here claimed must either be expressly given, or it must be indispensable to the existence of the company; and the power here contended for is the absolute power of the company to charge whatever rates of toll it pleases uncontrolled and uncontrollable by the legislature. Charles River Bridge Co. vs.Warrington Bridge Co., 11 Pet. 546.
But the power of the legislature to regulate the tolls of the company, is after all, a part of the police power of the *Page 520 
legislative department of the Scale government, and the test of that power is whatever is necessary to preserve the rights of the citizen without invading another. 2 Redf on Railways, 407, n. 3.Cool. on Const. Lim. 572, 594. And such a power must be vested in the legislature, and be subject to its discretion, and such a power being absolutely necessary in the legislature for the protection of the people, the court cannot consider that the legislature can ever part with it by implication merely.
Gordon, for the defendant below, appellant. The fourth section of the statute in question contravenes that provision of the tenth section of the first article of the constitution of the United States, which prohibits a State from passing any act impairing the obligation of contracts, because the charter of the P., W. B. R. R. Co. constitutes a contract within the meaning and protection of it, between the State and the company; and that section of the statute, which undertakes to prescribe and regulate the rates which the company may charge for the transportation of passengers and freight, is in direct conflict with that provision of the charter by which the company is authorized to demand and receive such sum or sums of money for tolls of persons and property as the directors of it should from time to time think reasonable, provided that the toll on any species of property should not exceed eight cents per ton per mile, nor on passengers four cents each per mile, and also with that other provision of the charter by which the company was authorized to erect the necessary and appropriate buildings, and to supply locomotive engines, cars and steamboats for the proper transportation of passengers, goods, wares and merchandise without any other limitation or restriction being imposed as to the rates which might be charged for such transportation.Dartmouth College vs.' Woodward, 4 Wheat. 519. Baileyvs. P., W. B. R. R. Co., 4 Han: 389. Trustees ofVincennes University vs. Indiana, 14 How. 268. Planter'sBatik' vs. Sharp. 6 How. 301. Piqua Bank vs. Knoop. 16How. *Page 521 
369. Binghamton Bridge Case, 3 Wall. 51. Norris vs.Abingdon Academy, 7 Gill Johns. 7. Grammar School vs.Burt 11 Venn. 632. Brown vs. Hummel. 6 Penn. 86.Commonwealth vs. Cullen, 13 Penn. 133. State vs.Heyward, 3 Rich. 389. People vs. Manhattan Co. 9 Wend.
351. Com. Bank of Natchez vs. The State, 14 Miss. 599.Backus vs. Lebanon, 11 N. H. 19. Michigan State Bank vs.Hastings, 1 Doug. 225. Bridge Co. vs. Hoboken Co. 2Beas. 81. Miners Bank vs. United States, 1 Green (Iowa)
553. Edwards vs. Jagers, 19 Ind. 407. State vs.Noyes, 47 Maine 189. Buffett vs. C. 11". R. R. Co.25 Ill. 353. People vs. J. M. R. R. Co.9 Mich. 285. Bank of the State vs. Bank of Cape Fear, 13 Ired. 75.Mills vs. Williams, 11 Ired. 558. Hawthorne vs. Culeff,2 Wall. 10. Wales vs. Stetson, 2 Mass. 146. King vs. DedhamBank, 15 Mass. 447. Nicholls vs. Bertram, 3 Pick.342,
It was admitted on the other side that the charter constitutes a contract between the State and the company, though not a contract which has any force or effect in relation to this matter. But it not only constitutes on the part of the State a contract with the company in relation to this and every other valuable right, franchise and privilege granted and conferred by it, but also with the other sister States under their joint and concurrent legislation for the union and consolidation of the several original parts or links of their railroad lying within their respective limits, into one continuous railroad under the control, management and ownership of one united and consolidated company. By the second section of the original charter of the company which constructed the portion of it in this State, as soon as four thousand shares were subscribed to the stock of it, the subscribers were declared to be incorporated by the name of The Wilmington and Susquehanna Railroad Company, and by the same name to have perpetual succession, and be able, among other things, to ordain and enforce such by-laws and regulations as should be deemed necessary and convenient for the government of said corporation, not repugnant to the constitution and *Page 522 
laws of the United States and of this State, and generally to do all and singular the matters and things which to them it shall lawfully appertain to do for the well being and ordering of the same; while by the third section of it, among other things, it is also provided when and how the president and directors of the company shall be chosen, and who may make such by-laws, rules and regulations (not repugnant as before stated) as may be necessary to the well governing the affairs of the company; and by the seventeenth section of it, it is expressly provided that on the completion of the said railroad, the same shall be esteemed a public highway for the conveyance of passengers and transportation of merchandise and commodities, under such regulations as shall be prescribed by the directors; and it shall and may be lawful for the said company to demand and receive such sum or sums of money for tolls of persons and property, as they shall from time to time think reasonable, provided that the toll on any species of properly shall not exceed eight cents per ton per mile, nor on passengers four cents each per mile. That act of incorporation was passed on the 18th day of January in the year 1832, at the very inception of such enterprises and when railroads were comparatively novel and untried things in this country, and when the projectors of them were not yet aware that it would be impracticable for the public to use them like turnpike roads, or to operate them without the necessary machinery and rolling stock furnished for them by the companies owning them; and, therefore, we should not be surprised to find in the next succeeding section of the charter, a provision that if the owner or driver of any ear. carriage, wagon, or conveyance upon the said railroad, shall pass by any place appointed for receiving tolls, without making payment thereof, he should forfeit and pay for every such offence, the sum of twenty dollars to the company. But strange and unreasonable as such a provision may now seem to us, it would clearly serve to show that when the legislature then imposed or prescribed the limitation of tolls of persons *Page 523 
and property in the preceding section, it did not contemplate that even at those rates, the company was to incur the expense of supplying the rolling stock and carrying the passengers and goods in addition to building and supplying the road itself for such purposes. And for that reason he had no hesitation in saying that even those limitations could have no application in such a case, and that, consequently the charter is practically without any limitation whatever as to the rates of fare and freight to be charged by the company in such a case, and as the road has in point of fact been equipped and operated solely by the company itself ever since it was made.
Now the main, if not the only object which both the legislature and the company had in view, the one in granting and the other in accepting the charter, was to build the railroad and carry persons and property over it for hire, and alike for the accommodation and advantage of the public, and the remuneration and profit of those who should embark their capital in the building and operation of it. This was, therefore, the essential right and franchise conferred by the legislature on the company when it was incorporated, and without which no other power, right or franchise conferred by its charter, could be of any value to it. And this essential right and franchise to charge for the carriage or transportation of passengers and property having thus been granted without any limitation or qualification, and entirely committed to the discretion of the company to regulate the rates to be. charged for such transportation as the directors of it should deem reasonable, in consideration of which every stockholder in it may have subscribed or become a member of it, how can the legislature now abridge or restrict that franchise against the will of the company without impairing the obligation of the contract by which it was granted and guaranteed to it under the provision of the federal constitution? At common law what would constitute a reasonable charge by a common carrier for the transportation of goods would be a legal and judicial question for the consideration and decision of a *Page 524 
court, and jury, and is not a question for the decision of the legislature.
Under the rates of the company when this statute was enacted the charge for a few miles, or the shortest distance, was nine cents per hundred pounds of freight, but from Baltimore to Delmar, a distance of one hundred and sixty-three miles, and the greatest distance between any points on the roads of the company, the charge was only sixty-one cents per hundred pounds. And at the former rate under this statute, it could only charge thirty-seven hundredths of a cent per hundred pounds for a few miles, or practically nothing at all, or it would be constrained to charge for the latter and longest distance two dollars and sixty-two cents, instead of sixty-one cents per hundred pounds. If the statute is valid and constitutional and binding upon the company, it must do one or the other, and as the former would be practically impossible on a very large proportion of their freights for short distances, the latter rate would have to be adopted for all distances, which would be alike ruinous both to the company and to all freighters, and would render the act a fatal injury, instead of a benefit, to the people of the State. Under the existing tariff of rates where one class of freights is only twelve dollars and twenty cents per ton between the two points stated, it would have to be under the statute, if the company is bound by it, fifty-two dollars and forty cents per ton. It was, therefore, apparent that the fourth section of the act in question was as unwise and injudicious as it was unconstitutional in its character.
Cemegys, on the same side. Whenever a grant is made to a company every thing necessary to the power is granted with it, for such is the general principle of implication in all corporate grants. The counsel on the other side had rested the power of the legislature, to pass the section of the act in question, on two grounds, the police power of the State, and the power residing in the Legislature to regulate common carriers. The police power of a State *Page 525 
has been defined in the authority cited by him, and he was content with that definition. It extends to the protection of the lives, limbs, health, comfort and quiet of all persons, and of all property within it. It must, of course, be within the range of legislative action to define the mode and manner in which every one may so use his own as not to injure others. By the general police power of the State, persons and property are subjected to all kinds of restraints and burdens, in order to secure the general comfort, health and prosperity of the State; of the right of the legislature to do which, no question ever was, or upon acknowledged general principles, ever can be made, so far as natural persons are concerned. Thorpe vs. R. B. R. R. Co. 27Venn. 149. Cool. Const, him. 572. That power however does not concern the business of men in general, or of incorporated companies either, but only so far as it prejudicially affects the comfort, health, safety and well being of others. Under this power the legislature can if it sees proper, regulate the speed of railroad trains, require signals to be displayed or given to avoid danger and prevent injury to persons both on or off the trains, and even to preclude the overloading of them, and such other like salutary restraints for similar purposes. But under that well known and well understood power for such important and special purposes, the legislature can no more interfere with or attempt to regulate the general rates of freight or fares on railroads, than it can under the same power claim to regulate wages of individuals, or prescribe or limit the prices to be charged by a co-partnership in its business; for under that power the legislature has no more authority for the object and purposes of it, over any company incorporated by it, than it has over any individual under the like circumstances, unless that authority is expressly reserved to it in the charter of the company.
It was not necessary to consider or inquire what authority or power the legislature may have to regulate the charges of an individual, or of two or more persons conducting *Page 526 
the business of a common carrier at common law merely, and without any charter or act of incorporation conferring upon him or them the right to conduct and charge for such business in a corporate name, and as a corporate franchise and privilege, for in the former case there could be no contract either express or implied between the State and such a common carrier in regard to the matter, and, therefore, no question as to the impairment of the obligation of it, could possibly arise in any such case. But here we have a, common carrier, not at common law, but expressly made and incorporated by a statute as such, with chartered rights, franchises and privileges, and with full and ample powers, first to construct at vast expense, but at their own cost, a great railroad, and afterward to operate it, and to manage and regulate its business and to charge for the service and facilities afforded by it to all who might have occasion to use it, such rates of compensation as the directors might think reasonable, without any limitation or restriction on their discretion except that which is expressly imposed by the proviso contained in the seventeenth section of the charter; and without any reservation of the right to further limit or restrict it, there could be no question on the authorities cited by his colleague, that such a charter constitutes a contract between the State and the company that it shall have and retain this, as well as other rights and franchises granted and conferred by it, undiminished and unimpaired by any future act of the legislature without the consent of the company, and, therefore, the fourth section of the statute which had been made a part of the case stated, was unconstitutional. If not so held to be by the court, it would be difficult to estimate or detail the evils which it will entail alike on the company and the community which it serves. Under it, if the company should even issue commutation tickets, which is common with all railroad companies, and not unfair or unjust in principle, it would constitute a prohibited discrimination and would subject it to the forfeiture of ten-told the difference of the price between a *Page 527 
regular and a commutation ticket, nor could there be anymore excursion trains, or special trains on any occasion at reduced rates, or at either more or less than the usual and one uniform scale of charges, for it distinctly provides that no discriminations are to be permitted. But these were only a few of the illiberal and injurious constructions that could and would be given to it.
Lore, Attorney General, on behalf of the State. The design of the legislature and the sole object of the section in question was simply to prevent any injust discriminations by this, or any other railroad company, against the people of this, and in favor of the people of any other State, which, it was alleged, had been made by it. Or, in other words, the object simply was to establish a just equality of rates between our own citizens and the citizens of other States; and although the phraseology of the section was not as clear and explicit as it might and should be, the simple meaning of it is that for the like or the same distances over the roads of this or any other company, the rates imposed upon our own citizens shall be the same as those imposed upon the citizens of other States, which would be in strict accordance with the charter of the company, and with any contract that might be implied in it between the State and the company; and if the section was susceptible of that construction, or such a construction as would obviate the objection made to the constitutionality of it, the Court would be bound to so construe it. Bailey vs. P., W. B.R. R. Co., 4 Harr. 389. Cool. Const, him. 574. The Court was further bound to presume it to be constitutional, until the contrary satisfactorily appeared. Whether it was properly embraced in the police power of the State, or not, he had no doubt whatever of the constitutional power of the legislature to regulate the rates of the railroad companies of the State, which were the creatures of its own making, so far, at least, as to prevent any discrimination in rates in favor of the people of any State, or of any community and against *Page 528 
those of another for the like amount of service rendered to each of them. For if the legislature had not this power, then it would be competent for such a company by such an odious and unjust discrimination, to build up one community upon the ruins of another, so far as it could be effected by the management of its business. And it had been so decided in the recent case of The People vs. The Chicago Alton Railroad Company in the Courts of Illinois. And if such was, as he believed, the true and proper meaning and construction of the section in question there could be no difficulty or inconvenience whatever in the company's regulating its rates in conformity with it.
The questions reserved in these actions for the opinion of the Court of Errors and Appeals draw under consideration the validity of the fourth Section of An Act of the General Assembly of this State, passed at Dover, April 11, 1873. The provision in controversy is in these words, viz.: —
SECTION 4. — That if the said Philadelphia, Wilmington and Baltimore Railroad Company, or any other railroad company in this State, shall, either as the operator of its own railroad or railroads, or as lessee of other railroads within the State, charge and receive a greater rate per mile for the carriage of passengers (except so far as the same may be increased to the amount of the tax annually paid under the provisions of Chapter 458, Volume 12 of the laws of Delaware) or for the carriage or transportation of goods, wares or merchandise or other property whatsoever, from place to place within the State, or from a place within the State to a place without the State, than is charged by such company for the carriage of passengers and the transportation of property or freight for like distances, or per mile, from places without the State to places within the State, or from places without the State through the State to other places without the State, the person or *Page 529 
persons paying such charges, either as fare or freight, shall be entitled to recover from such company so charging and receiving the same, a sum of ten-fold the amount of the money so paid, to be recovered in an action of debt or assumpsit, as like amounts are now recovered by law.
Several objections to this statute were made at the bar. The objection which in the judgment of the Court is decisive, and upon which alone its opinion will be given, is that which treats the Act as within the clause of the Constitution of the United States, which declares that no State shall pass any "law impairing the obligation of contracts." — Art. I, Sec. 10.
A wide range of argument was taken, but among all the questions discussed two only are material. These are, (1) is the charter of the Philadelphia, Wilmington and Baltimore Railroad Company a contract in the sense, of the constitutional provision? and (2) if it be such, then does the Act impair its obligation?
Both these questions are answered by rules for the construction of this provision of the Constitution long since established by the Supreme Court of the United States — the tribunal which is the ultimate and only authoritative expounder of the Federal Constitution.
In the first place, then, since the. decision of the celebratedDartmouth College Case, in 1819, (4 Wheat. S. C. Rep.
518) it had ceased to be a point for discussion that a corporate charter is a contract within the prohibitory clause referred to; and further, that a charter is none the less protected against legislative interference, although the franchise granted be one in the exercise of which the public are interested, if, nevertheless, the corporation itself be a private one. For, the uses of a corporation may in a certain sense be public, and yet the corporation, with its franchises and property, be private, — as much so as if such franchises and property were vested in a single, person instead of in a company; and nothing can be clearer than that franchises and property which in their nature, are private must be equally inviolate whether vested in a *Page 530 
corporation or in an individual. To this class of private corporations for public uses belong a large number, such as colleges, banks, insurance, turnpike companies, c. A broadly marked distinction is taken in the Dartmouth College case between these quasi-public corporations and chose of a more limited class which are strictly public corporations. The latter might be more properly distinguished as civil or municipal corporations. These are created by the Legislature solely for purposes of local government, such as are incorporated cities, towns, or counties. They are depositories of a portion of the political power of the State, which they exercise not as a private franchise but as a public trust, — as the mere agents or trustees of the Legislature, subject to its supervision and control. Such a charter is not in any proper sense a contract inter partes, within the prohibitory clause of the constitution. It is therefore revocable, and is subject U) alteration at the pleasure of the Legislature, saving any private rights and interests which may have previously become vested under the action of the corporate body. But charters creating what may be termed business corporations possess all the ingredients of contracts. First, there are parties, whose concurrent action is essential to give them force and effect, the government proffering and the corporations accepting the franchise, with such privileges and conditions as the Legislature may see fit to attach to it. There are also mutual obligations impliedly assumed by the parties, — the Government becoming bound, on the one hand, for the secure enjoyment by the grantees of the corporate franchise, according to the terms and conditions of the charter, and the corporators, on the other hand, undertaking, in consideration of the privileges bestowed, to exercise them faithfully for the purposes contemplated in the grant of them. Further the business conducted under such charters, quite as much as like enterprises set on foot by persons unincorporated, is provided for by private capital invested by the corporators for their individual profit, and the property *Page 531 
held and employed by the corporation belongs to the corporators. The State takes no part in the outlay or profits of the enterprise, and holds no interest whatever in the corporate property or effects, except in some special instances in which the State becomes a stockholder. The corporate franchise itself, although created by the Legislature, becomes when vested by due acts of acceptance, a species of private property, and is recognized and protected at common law as fully as any other kind of property. The interest which the public have in the objects and operations of these business corporations is purely incidental, and in no degree detracts from the private nature of the corporation and of its franchises.
The Supreme Court in the Dartmouth College case, in its most elaborate examination of this subject, found that at common law charters of incorporation had always been recognized and treated as contracts between the crown and the grantees; that it is not competent even for royal prerogative, without the consent of the corporation, to alter or abridge them; that they could be revoked only in the case of a forfeiture for negligence or abuse of the franchise, judicially ascertained. The Court, therefore, considered that charters were strictly and technically within the language of the Constitution, since that instrument must be presumed to have employed the term "contract" according to its settled usage at common law. And this construction the Court found to be supported by all the considerations of policy which led to the adoption of the prohibitory clause; since for no species of legal rights could the protection of the clause be more important than for those created by charters, whether we consider the heavy outlays of capital often made under them, the value of the property acquired, or the public interests not infrequently involved in their objects and operations. So clearly did the Supreme Court consider all charters (other than such as are strictly public or municipal) to be within the prohibitory clause, that in the case cited they extended the protection of the clause *Page 532 
to a charter which was granted not for private gain or profit, nor for any of the ordinary purposes of trade or business, but purely for a public charity, i. e. for the christianizing of Indians and the education of youth. For the Court considered that the corporate franchise, for whatever object it might have been granted, together with the right to exercise it according to the terms and conditions of the charter, was itself, when once vested, a legal right, and as such was as well entitled to the protection of the constitution and laws as were any of the more tangible species of private property, for the acquiring or holding of which corporations are ordinarily created.
It need only be further remarked on this point that our Court of Errors and Appeals has already accepted the ruling of the Dartmouth College case as the law of this State, and, as it happens, has applied it to the protection of the very corporation now before us. InBailey vs. The Philadelphia, Wilmington and Baltimore RailroadCo., 4 Marring. 389. the charter of this company was held to be a contract within the prohibitory cause of the Federal Constitution, and an Act of the Legislature abridging certain corporate privileges under it was on that ground held to be invalid.
We may next proceed to inquire whether the Act of the General Assembly under consideration impairs the obligation of the contract contained in the charter of the railroad company. And to this question also the Dartmouth College case will be found to afford a clear and conclusive answer.
The sense of the phrase "impairing the obligation of a contract" and the precise effect of the constitutional prohibition will vary somewhat according to the subject matter to which it is applied. In the case of contracts wholly executory, which were doubtless those directly contemplated by the Constitution, the operation of the Cause would be to prohibit any law discharging or releasing a party to the contract from the stipulations *Page 533 
undertaken to be performed on his part, or modifying such-stipulations. It is thus that a State insolvent law which undertakes to discharge a debt contracted prior to its passage comes in conflict with the constitutional provision. Where the contract is an executed one, as is a grant, the obligation of it is held to be impaired by a law operating to divest any right or estate which has passed or become vested under the grant. Such was the construction of the phrase under consideration in the celebrated case of Fletcher vs. Peck, 6 Cranch 87, in which an Act of a State Legislature, undertaking to re-assume rights which had vested under a grant made by a prior Legislature, was held to impair the obligation of the contract implied in the grant. The Dartmouth College case was the first in which this phrase "impairing the obligation of a contract," received a direct judicial construction as applied to a corporate charter. Such a charter would seem to be quite clearly within the principle of Fletcher vs. Peck. For treating a charter simply as a grant or executed contract, the franchise which is the subject matter of the grant, must be as clearly protected by the Constitution against any revocation or abridgment of it, as is a title to land which may be the subject of a legislative grant. But a charter is a contract both executed and executory; and viewing it in the latter aspect, the Court in the Dartmouth College case held that in the grant of a charter there is an implied contract on the part of the Government that the corporators having accepted the franchise, shall, so long as they exercise their corporate powers faithfully, in accordance with the ends and purposes of their incorporation, enjoy the franchise as fully and beneficially as it is granted, without abridgment or alteration. Hence the Court deduced as the principle of its decision, that a law altering the charter in any of its material provisions, without the consent of the corporation, impaired the obligation of the contract. Now, what will or will not amount to such a material alteration of the charter as to bring a law into conflict with the *Page 534 
constitutional prohibition it may not be easy to define, but it is sufficient and quite safe to say that an Act having the effect to abridge or restrict any power or privilege vested by the charter which is material to the beneficial exercise of the franchise granted, and which must be supposed to have entered into the consideration which induced the corporators to accept the charter and to assume the duties imposed by it, is such an alteration as the constitutional provision forbids, and that any Act so operating is invalid.
Let us apply this principle to the case in hand. The object and effect of the law under consideration is to regulate, and so far to restrict, the power of the railroad company to charge for the transportation of passengers and freight. Of such a power it is hardly enough to say that, it is one of value and importance to the company; it is one essential to the enjoyment of the franchise, and must be presumed to have been the consideration for which the corporators accepted the charter, invested their money, and assumed the obligations imposed upon them. I; was undoubtedly competent for the Legislature, by a provision in the charter, to reserve to itself the right to supervise and regulate in the future this power of the company; but, upon a careful examination of the original Acts incorporating the several companies now composing the Philadelphia, Wilmington and Baltimore Railroad Company, we are unable to find in them any reservation of such legislative control over these companies as is necessary to sustain the Act under consideration. The power to adjust its tariff of charges by its own officers, according to their views of the necessities of business and of justice to the public, without supervision, was a part of the franchise as it was granted. The attempted regulation by the Legislature of this power materially abridges the beneficial exercise of it by the corporation, and without any doubt impairs the obligation of the contract in the sense of the constitution as interpreted by the Dartmouth College case. The question *Page 535 
is not admissible in what degree the power of the company to charge is restricted by the statute, or whether the regulation enacted by it is or is not a reasonable or proper one. The principle is that any material modification of the charter, or of the franchises or powers granted under it, is prohibited by the Constitution. In the Dartmouth College case the amendment of the charter by the Legislature of New Hampshire appears to have been made in good faith, with a view to enlarge the sphere and increase the usefulness of that institution. What was before a college only was by the Act converted into a university; the original board of trustees was increased in number, and the general administration of the institution by the trustees was made subject to the supervision of a Board of Overseers, who were to be appointed by the Governor and Council, and who thus directly represented the State. Says Chief Justice Marshall, in his opinion, after detailing these changes: "This may be for the advantage of this college in particular, and may be for the advantage of literature in general, but it is not according to the will of the donors, and is subversive of that contract on the faith of which their property was given." Mr. Justice Washington, also, speaking to the same point, says: "In all respects in which the contract has been altered without the assent of the corporation, its obligations have been impaired, and the degree can make no difference in the construction of the above provision of the Constitution."
It may be worth while to notice here, that the operation of the statute of New Hampshire upon the charter of Dartmouth College, was essentially similar to the effect of the Act of our General Assembly now under consideration. The governing power of the College was by the original charter vested exclusively and without restriction in the Trustees therein appointed and their successors. By the amendment to the charter this power was subjected to the supervising control of the State through a Board of Overseers to be appointed by its *Page 536 
officers, the Governor and Council; and thus what had been under the charter an absolute power of administration in the corporators was brought under the regulation of the State. This modification was strongly commented on by the Chief Justice as the feature of the New Hampshire statute which was most clearly repugnant to the constitutional prohibition. Precisely such is the effect of the Act before us. It assumes for the State the right to regulate what under the charter was granted as an absolute discretion in this corporation, viz., the right to adjust its tariff of charges for the carriage of passengers and freight.
We have attentively considered the arguments urged with much ingenuity and force by the learned counsel who maintained the validity of this Act. Among them the argument of greatest force, and the one most relied on, was an effort to bring the Act within the scope of those legislative powers which are so essential to good government and the social welfare that they are treated as inalienable; so that one Legislature cannot, even by contract, abridge the full control of a succeeding Legislature over the same subject matter. Such, for example, is the right of the Government at all times to provide for the common defence, to take private property for the public use. to raise revenue, and what is termed the police power of the State. It was the last of these inalienable powers, viz., that of internal police regulation, to which the Act before us was in the argument sought to be referred. The importance of the question here raised requires and has received our serious consideration.
The police power of the State comprehends all those general laws of internal regulation which are necessary to secure the peace, good order, health, and comfort of society. We are now concerned, not so much to discuss this power at large as to ascertain, with sufficient precision for the case before us, what is the proper limit of the State police power in its bearing upon chartered rights and privileges, as these are protected by the Constitution of the *Page 537 
United States. It is not difficult to ascertain a rule sufficiently definite to be readily applied to cases, and one securing all interests involved-saving to the State, on the one hand, all needful authority for the legitimate purposes of police regulation, and yet, on the other hand, not trenching upon the constitutional protection of chartered rights Such a rule would seem to be this: that the Legislature may at all times regulate the exercise of the corporate franchise by general laws passed in good faith for the legitimate ends contemplated by the State police power — that is for the peace, good order, health, comfort, and welfare of society — but that it cannot, under color of such laws destroy or impair the franchise itself, nor any of those rights or powers which are essential to its beneficial exercise. Thus, Acts regulating the mode of carriage of passengers with a view to their safety, or regulating the speed of travel through towns or cities, or prescribing certain precautions for the public safety at crossings or requiring the erection of fences, c., c., are proper exercises of the power of police regulation. Such Acts leave the franchise unimpaired and simply regulate the exercise of it in some particulars plainly essential to the general safety, health or comfort of society. But quite different are Acts which directly touch the constitution of the corporation or abridge or modify any of those corporate powers which are essential to the very ends of its creation; such powers, for example, as the right to operate a railroad at all the right to take tolls, or fares and freights, or to adjust their tariff of such charges. These are not police regulations but are in substance and effect amendments of the charter; and it is most obvious that if, under color of the police power, corporations may be thus dealt with, the constitutional provision, so solemnly adjudged by the Supreme Court to be a protection to their rights is after all, as to them, wholly nugatory.
This view of the limit of the police power, as exercised over corporations, was taken by the Supreme Court of Vermont m Thorpe vs.The Rutland and Burlington Railway, *Page 538 27 Vt. 140, cited fully in Redfield on Railways, ch. 31,sec. 2, note 1. That case drew into question the right of the Legislature to require existing railway companies to respond in damages for cattle killed or injured by their trains until they should erect suitable cattle guards at farm crossings. The Court, in the course of an elaborate discussion by Chief Justice Redfield of the general liability of corporations to legislative control, say: "It must be conceded that all which goes to the constitution of the corporation and its beneficial operation is granted by the Legislature, and cannot be revoked, either directly or indirectly, without a violation of the grant, which is regarded as impairing the contract, and so prohibited by the United States Constitution." Again, they say, "the privilege of operating the road, or taking tolls or freight and fare is the essential franchise conferred. Any Act essentially paralyzing this franchise, or destroying the profit therefrom arising, would no doubt be void. But beyond that the entire power of legislative control resides in the Legislature," c. And the Court proceeded to sustain the Act before them, requiring the erection of cattle-guards, as an act of police regulation only, such as did not impair the franchise or any of its essential rights or powers. In a late treatise on the subject of Constitutional Limitations by Judge Cooley, p. 577, upon an extended and very satisfactory examination of the point now before us, substantially the same limitation is drawn to the exercise of the police power as affecting chartered rights. The requisites to the valid exercise of the police power the author holds to be these: "The regulations must have reference to the comfort, safety, or welfare of society; they must not be in conflict with any of the provisions of the charter: and they must not, under pretence of regulation, take from the corporation any of the essential rights and privileges which the charter confers. In short, they must be police regulations in fact, and not amendments of the charter, in curtailment of the corporate franchise. The maxim, sic utere tuo ut alienum non lacdas, is that which lies at the foundation of the power, *Page 539 
and to whatever enactment affecting the management and business of private corporations it cannot fairly be applied, the power itself will not extend. It has accordingly been held that where a corporation was chartered with the right to take toll from passengers over their road, a subsequent statute authorizing a certain class of persons to go toll free, was void. Pingrey vs. Washburn, 1 Aiken 268. This was not a regulation of existing rights, but it took from the corporation that which they before possessed, namely, the right to tolls, and conferred upon individuals that which, before, they had not, namely, the privilege to pass over the road free of toll."
The Attorney General, who appeared on behalf of the State, put in the strongest possible form the argument in support of this Act as an exercise of internal regulation, by insisting that there must at all times inhere in the Legislature an authority to protect the public against extortionate charges and unjust discriminations by carriers exercising a public employment, and that to this power railroad corporations, as well as other common carriers, must be held amenable. That the Legislature possesses the general power here claimed for it is not doubted; but the real question still remains, viz., in what mode may such power be constitutionally exercised, — at least over corporations? The answer is, that the Legislature may by general laws forbid extortion and unjust discrimination on the part of common carriers, as it may prohibit any other offence against social order or the general welfare. It was not disputed in the argument that for the breach of such laws, corporations as well as natural persons may be held liable; but such liability would be enforced by a judicial proceeding, in which the alleged extortionate or unjustly discriminating character of the charges drawn into question would be judicially ascertained. Such remedies against common carriers already exist at the common law, and to these as well as to the common law liabilities of common carriers generally, incorporated carriers as well as natural persons are subject by the public nature of their employment. Very different, however, from such a mode of regulation *Page 540 
by general laws, with a liability to judicial remedies, is the attempt by a legislature to prescribe in advance a tariff of charges for carriers, — to do which is in effect to take out of their hands the management of their own business. This certainly cannot be done in the case of a corporation. How far the Legislature can directly regulate charges by common carriers not incorporated is a question not now arising; but the right of a corporation to conduct its own business — to adjust its tariff of charges (subject to the implied condition that such charges shall not be unreasonable) stands upon a special ground not applicable to an unincorporated carrier. For such right, being a part of the corporate franchise granted by charter, is protected by the Constitution of the United States. And this brings the case back to the view before presented as to the true limitation of the police power over corporations. It is the only view by which both the general power of police regulation by the State over corporations and their due protection under the Constitution can be preserved and kept in harmony.
Enough has been said to show to what conclusion the Court is impelled. We are of opinion that, inasmuch as the Act under consideration assumes the absolute power to regulate and control the exercise of a corporate right which was granted to this company as a part of its franchise, without any reserved power of such future regulations by the Legislature, it is not a legitimate exercise of the State police power, but is in substance and effect an alteration of the charter, and materially impairs the obligation of the contract in the sense of the constitutional prohibition as interpreted by the Supreme Court. The constitution, so interpreted, is the supreme law of the land, and we have no alternative but to apply it to the case before us. A contrary judgment of this Court would be practically an attempt to subvert the Constitution of the United States within this State.
Let a certificate answering the question reserved be drawn in accordance with this opinion. *Page 541